920 So.2d 1175 (2006)
STATE of Florida, Appellant,
v.
James RABB, Appellee.
No. 4D02-5139.
District Court of Appeal of Florida, Fourth District.
February 15, 2006.
*1177 Charles J. Crist, Jr., Attorney General, Tallahassee, and Claudine M. LaFrance, Assistant Attorney General, West Palm Beach, for appellant.
Charles Wender of Charles Wender Attorney-at-Law, Chartered, Boca Raton, for appellee.

ON MOTION FOR REHEARING AND REHEARING EN BANC AND/OR CERTIFICATION OF QUESTION OF GREAT PUBLIC IMPORTANCE OF OPINION ON REMAND FROM THE UNITED STATES SUPREME COURT
GUNTHER, J.
We deny the State's motion in all regards. However, we withdraw our previous opinion on remand and substitute the following opinion in its place in order to both incorporate our initial opinion, State v. Rabb, 881 So.2d 587 (Fla. 4th DCA 2004), clarify portions of that opinion, and address the specific issue on remand from the United States Supreme Court.
*1178 The State appeals the trial court order granting James Rabb's[1] motion to suppress. James Rabb was charged with possession of Alprazolam (Xanex), possession of 3, 4-Methylenedioxymethamphetamine (MDMA), and possession of cannabis (marijuana). Rabb moved to suppress the drugs recovered from his house pursuant to a search warrant. The warrant had been issued based on a probable cause affidavit stating, inter alia: "Based on the information provided by the confidential source, the cultivation of cannabis books and video's located in Mr. Brown's vehicle, the cannabis located in Mr. Brown's vehicle as well as his person and the drug detector dog alert on the residence, your Affiant believes that a cannabis growing operation is located inside the residence." The trial court granted Rabb's motion to suppress. We affirm.
The entire Affidavit and Application for a Search Warrant (probable cause affidavit) states:
On April 19, 2002 a source of information, who requested to remain anonymous, called the Broward Sheriff's Office and stated that a white male subject who was born in 1967, by the name of John Brown had a cannabis grow operation in his residence. The source further explained that the residence is located on Polk Street in Hollywood, behind the Howard Johnson's Hotel.
Your Affiant and Det. Taranu investigated the allegation. A check of the Broward County Property Appraisers Office revealed that John Brown owned a residence on Polk Street in the City of Hollywood, 2839 Polk Street. During the investigation John Browns vehicle, 2011 Pontiac Firebird, Fl tag, LPS485, was observed parked in front of the residence on several occasions.
On April 23, 2002 at approximately 1530 hours, Det. Taranu and your Affiant initiated surveillance on the residence. At 1600 hours a white male, identified as John Brown, exited the residence and entered the 2001 black firebird. Mr. Brown traveled West on Polk Street, cut through the Howard Johnson's parking lot to Hollywood Blvd and entered Interstate 95 North bound. Mr. Brown traveled North on Interstate 95 with Det. Taranu and your Affiant following. During the surveillance Mr. Brown made an improper lane change and was driving approximately forty miles per hour in a fifty-five mile per hour zone. At 1610 hours a traffic stop was initiated on Mr. Brown. While Mr. Brown was changing lanes to stop in the outside emergency lane your Affiant observed him placing his hands under the drivers seat and make several overt motions. Once Mr. Brown was stopped he was asked to exit the vehicle for officer safety. While Mr. Brown was exiting the vehicle your Affiant observed two cannabis cultivation books and one cannabis cultivation video on the front drivers seat of the vehicle in plain view. Your Affiant asked Mr. Brown for his drivers license. Mr. Brown was visually nervous, hands trembling while he was locating his license.
Mr. Brown was told that detectives were conducting an investigation and before he was asked any questions your Affiant needed to read him his rights. Mr. Brown was read his rights at which time he understood his rights and agreed to answer questions. Mr. Brown was asked if he had a cannabis grow operation *1179 inside the residence. Mr. Brown would not answer the question but stated that he was working inside the residence replacing dry-wall. Your Affiant then asked Mr. Brown about the books and video tape of cannabis cultivation inside the vehicle. Mr. Brown stated that he was just interested in cannabis cultivation.
While I was speaking to Mr. Brown Det. Taranu and his drug detector dog, "Chevy", checked the exterior of the vehicle. Det. Taranu's drug detector dog alerted to the exterior of the vehicle. The drug detector dog was then placed into the interior of the vehicle and alerted to the ashtray. One cannabis cigarette was recovered from the ashtray which field tested positive.
Your Affiant continued to speak with Mr. Brown who eventually stated that he wished to speak with an attorney. All questioning was terminated. Mr. Brown was advised that he under arrest for possession of cannabis and as detectives were about to place him into a BSO marked unit he stated that he had additional cannabis inside of his left shoe/sock. Two cannabis cigarettes were removed from Mr. Brown's left shoe/sock area. The cannabis field tested positive.
At 1705 hours Det. Taranu and his drug detector dog, "Chevy" walked by the front of the residence. The drug detector dog walked from the public roadway in front of the residence, up to the front door and alerted. The alert was consistent with previous alerts when narcotics were located. Furthermore, Sgt. Damiano and Det. Taranu walked to the front door of the residence and could smell the odor of cannabis emitting from the residence.
Based on the information provided by the confidential source, the cultivation of cannabis books and video's located in Mr. Brown's vehicle, the cannabis located in Mr. Brown's vehicle as well as his person and the drug detector dog alert on the residence, your Affiant believes that a cannabis growing operation is located inside the residence.
Based on this affidavit, a search warrant was issued for Rabb's house. When law enforcement entered the house, it discovered a cannabis grow operation and sixty-four cannabis plants. Additionally, a safe was discovered containing two MDMA tablets, Alprazolam tablets, and three cannabis cigarettes. The safe also contained a key to one of the grow rooms and Rabb's Social Security card and birth certificate, which presumably identified him as James Rabb and not John Brown. Based on the evidence recovered from Rabb's house, he was charged by information with possession of the controlled substance Alprazolam, possession of the controlled substance MDMA, and possession of cannabis in an amount of twenty grams or less.
Rabb filed a motion to suppress the evidence obtained from his house. He alleged, inter alia, that the evidence supporting the probable cause affidavit was obtained in violation of his "Fourth and Fourteenth Amendment Rights of the United States Constitution, as well as Article I, § 12 of the Florida Bill of Rights." Rabb contended that the anonymous tip regarding his house "set in motion a series of illegal and questionable acts conducted by the Broward Sheriff's Department" including the pretextual traffic stop of his vehicle and "invading [his] privacy rights, by entering onto his [] property with canine assistance and conducting a `search' of his property." As such, Rabb concluded that without this illegal conduct, there was no probable cause for the issuance of a search warrant for his house.
The State responded to Rabb's arguments by emphasizing the totality of the *1180 circumstances: there was an anonymous complaint alleging that marijuana and cannabis were being sold from Rabb's residence; the description of the residence and its occupant was very detailed; the traffic stop resulted in the discovery of manuals about the harvesting of cannabis; Rabb indicated he had an interest in growing marijuana; and Rabb possessed marijuana on his person. As such, the State contended, even if the drug detector dog search of Rabb's house was not conducted, "everything taken together certainly would provide these detectives with sufficient probable cause" that Rabb was conducting a marijuana grow operation in his house and support the issuance of a search warrant for his house.
The trial court granted the motion to suppress, recognizing that the question presented, "whether it is violative of the Fourth Amendment to conduct a dog sniff of a private residence in order to obtain probable cause for the issuance of a search warrant," was one of first impression in Florida. Considering United States v. Thomas, 757 F.2d 1359 (2d Cir.1985), as persuasive precedent, the trial court concluded that the use of the dog sniff of Rabb's house amounted to a warrantless search and could not support the issuance of the subsequent search warrant for Rabb's house. The trial court then undertook to determine whether, without the dog sniff of his house, there was sufficient independent and lawfully obtained evidence from the anonymous tip and the traffic stop to establish probable cause to obtain a search warrant for Rabb's house. The trial court concluded that probable cause was lacking where "[t]here was no indicia of a marijuana grow house, i.e., covered windows, high pedestrian traffic, higher than normal use of electricity, etc.," the informant's veracity was not established in the affidavit, and the marijuana in Rabb's car did not establish any illegal activities in his house. The trial court did not address the cannabis cultivation books or video discovered in Rabb's vehicle.
Typically, "[t]he standard of review applicable to a motion to suppress evidence requires that this Court defer to the trial court's factual findings but review legal conclusions de novo." Backus v. State, 864 So.2d 1158, 1159 (Fla. 4th DCA 2003) (citing Batson v. State, 847 So.2d 1149, 1150 (Fla. 4th DCA 2003)). However, where the issuance of a search warrant based on a probable cause affidavit is at issue, the standard of review is not de novo, but rather a standard of "great deference." See United States v. Soderstrand, 412 F.3d 1146, 1152 (10th Cir.2005). This standard of "great deference" is defined as follows:
"The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the `veracity' and `basis of knowledge' of persons supplying hearsay information there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of reviewing courts is simply to ensure that the magistrate had a `substantial basis for ... conclud[ing]' that probable cause existed."
DeLaPaz v. State, 453 So.2d 445, 446 (Fla. 4th DCA 1984) (quoting Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)); see also Schmitt v. State, 590 So.2d 404, 409 (Fla.1991) (same). When so reviewing the issuance of a warrant based on a probable cause affidavit, a court is confined to a consideration of the four corners of the probable cause affidavit. See Schmitt, 590 So.2d at 409; Brachlow v. State, 907 So.2d 626, 628 (Fla. 4th DCA 2005). In sum, "[a]lthough the reviewing court `should afford a magistrate's probable *1181 cause decision great deference,' it should `not defer if there is no "substantial basis for concluding that probable cause existed."'" United States v. Beck, 139 Fed.Appx. 950, 954 (10th Cir.2005).
The Gates standard of review of the issuance of a warrant based on a probable cause affidavit centers on three key terms: "probable cause," "fair probability," and "substantial basis." As for probable cause:
As a legal concept, "probable cause" is not capable of a bright-line test. Rather, it involves a fact-intensive analysis that necessarily varies from context to context. In particular, the courts are required to weigh two interests that usually are in conflict: society's recognition that its police forces should be given discretion to investigate any reasonable probability that a crime has occurred, and the individual's interest in not being subjected to groundless intrusions upon privacy.
Schmitt, 590 So.2d at 409. Such probable cause exists where the probable cause affidavit "reveals `a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Syphers, 426 F.3d 461, 464 (1st Cir.2005) (citation omitted). Concerning this fair probability:
"`Probability is the touchstone' of this inquiry." United States v. Baldyga, 233 F.3d 674, 683 (1st Cir.2000) (quoting United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir.1997)). Thus, "[t]he standard of probable cause requires a probability, not a prima facie showing, of criminal activity." United States v. Burke, 999 F.2d 596, 599 (1st Cir.1993); see also United States v. DeQuasie, 373 F.3d 509, 518 (4th Cir.2004) ("The probable cause standard does not require officials to possess an airtight case before taking action." (internal quotations and citation omitted)).
Syphers, 426 F.3d at 464. The substantial basis supporting a fair probability and probable cause was discussed in Gates:
Our earlier cases illustrate the limits beyond which a magistrate may not venture in issuing a warrant. A sworn statement of an affiant that "he has cause to suspect and does believe that" liquor illegally brought into the United States is located on certain premises will not do. Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933). An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and the wholly conclusory statement at issue in Nathanson failed to meet this requirement. An officer's statement that "affiants have received reliable information from a credible person and believe" that heroin is stored in a home, is likewise inadequate. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). As in Nathanson, this is a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause. Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued. But when we move beyond the "bare bones" affidavits present in cases such as Nathanson and Aguilar, this area simply does not lend itself to a prescribed set of rules, like that which had developed from Spinelli. Instead, the flexible, common-sense standard articulated in Jones, Ventresca, and Brinegar better *1182 serves the purposes of the Fourth Amendment's probable cause requirement.
Gates, 462 U.S. at 239, 103 S.Ct. 2317.
The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Under Article I, Section 12 of the Florida Constitution, the right to be free from unreasonable searches and seizures "shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court." However, Article I, Section 12 of the Florida Constitution does not prevent this Court from granting heightened protection in the absence of United States Supreme Court precedent directly on point to the contrary. See Soca v. State, 673 So.2d 24, 26 (Fla.1996) ("However, in the absence of a controlling U.S. Supreme Court decision, Florida courts are still `free to provide its citizens with a higher standard of protection from governmental intrusion than that afforded by the Federal Constitution.'") (citation omitted).
The question emphasized by the parties in this case is whether a dog sniff at the exterior of a house is a search under the Fourth Amendment. In order to be classified as a search, law enforcement conduct must violate a "`constitutionally protected reasonable expectation of privacy.'" California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (quoting Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). Furthermore, as Justice Harlan pointed out in his concurring opinion in Katz: "As the Court's opinion states, `the Fourth Amendment protects people, not places.' The question, however, is what protection it affords those people. Generally, as here, the answer to that question requires reference to a `place.'" Katz, 389 U.S. at 361, 88 S.Ct. 507.
When considering whether law enforcement activity at a house constitutes a search, it is necessary to consider the constitutional protections afforded a house throughout the long history of the Fourth Amendment. At the center of the Fourth Amendment stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). In fact, "the `physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Payton v. New York, 445 U.S. 573, 585-586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). The Fourth Amendment operates to draw "a firm line at the entrance to the house." Payton, 445 U.S. at 589, 100 S.Ct. 1371.
Given the shroud of protection wrapped around a house by the Fourth Amendment, we conclude that Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), controls the outcome of the case at bar. In Kyllo, law enforcement, believing Kyllo to be growing marijuana in his house, employed an Agema Thermovision 210 thermal imager to scan his house and reveal heat signatures. Id. at 29, 121 S.Ct. 2038. The thermal scan revealed that a portion of the roof and one wall of the house were relatively hot compared to the remainder of the house and surrounding houses. Id. at 30, 121 S.Ct. 2038. As a result, law enforcement concluded that Kyllo was employing halide lamps to grow marijuana. Id. Combined with further information gathered, law enforcement *1183 obtained a warrant and discovered in excess of one hundred marijuana plants in Kyllo's house. Id. Kyllo was charged with manufacturing marijuana and moved to suppress the marijuana evidence seized from his house based on the use of the thermal imager. Id. The trial court and appellate court determined that use of the thermal imager did not amount to a search of Kyllo's house. Id. at 30-31, 121 S.Ct. 2038.
The United States Supreme Court reversed the lower courts, holding:
We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical "intrusion into a constitutionally protected area," constitutes a searchat least where (as here) the technology in question is not in general public use.
Id. at 34, 121 S.Ct. 2038. The Court also noted:
The Government maintains, however, that the thermal imaging must be upheld because it detected "only heat radiating from the external surface of the house." ... We rejected such a mechanical interpretation of the Fourth Amendment in Katz, where the eavesdropping device picked up only sound waves that reached the exterior of the phone booth. Reversing that approach would leave the homeowner at the mercy of advancing technologyincluding imaging technology that could discern all human activity in the home. While the technology used in the present case was relatively crude, the rule we adopt must take account of more sophisticated systems that are already in use or in development.
533 U.S. at 35-36, 121 S.Ct. 2038. The Court further stated:
The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained. In Silverman, for example, we made clear that any physical invasion of the structure of the home, "by even a fraction of an inch," was too much, and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor. In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes.
Id. at 37, 121 S.Ct. 2038 (emphasis in original). The relative warmth of Kyllo's house was deemed one of these intimate details, and it was a Fourth Amendment violation for law enforcement to employ a thermal imager to discern that intimate detail. Id. at 38, 121 S.Ct. 2038.
We now turn to the intersection between the staunchly-protected house, as discussed in Kyllo, and law enforcement's use of dog sniffs by trained canines to detect contraband. It is true that the United States Supreme Court held in United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), that "the particular course of investigation that the agents intended to pursue hereexposure of respondent's luggage, which was located in a public place, to a trained caninedid not constitute a `search' within the meaning of the Fourth Amendment." Id. at 707, 103 S.Ct. 2637. The rationale for the holding is that "the sniff discloses only the presence or absence of narcotics, a contraband item." Id. In Place, the United States Supreme Court was not addressing the use of law enforcement investigatory techniques at a house as in Kyllo, but rather only whether a dog sniff of luggage in a public airport constituted a search under the Fourth Amendment. The function *1184 of "place" in Fourth Amendment jurisprudence was instrumental in the decision in Place.
"Place" is no less key in the case at bar. We are of the view that luggage located in a public airport is quite different from a house, not only in physical attributes, but also in the historical protection granted by law. In United States v. Thomas, 757 F.2d 1359, 1366 (2d Cir.1985), the Second Circuit compared the dog sniff of luggage in Place with that of an apartment, and concluded that "a practice that is not intrusive in a public airport may be intrusive when employed at a person's home." The rationale for this conclusion is that "the defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be `sensed' from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation." Id. at 1367.
This logic is no different than that expressed in Kyllo, one of the recent pronouncements by the United States Supreme Court on law enforcement searches of houses. The use of the dog, like the use of a thermal imager, allowed law enforcement to use sense-enhancing technology to intrude into the constitutionally-protected area of Rabb's house, which is reasonably considered a search violative of Rabb's expectation of privacy in his retreat. Likewise, it is of no importance that a dog sniff provides limited information regarding only the presence or absence of contraband, because as in Kyllo, the quality or quantity of information obtained through the search is not the feared injury. Rather, it is the fact that law enforcement endeavored to obtain the information from inside the house at all, or in this case, the fact that a dog's sense of smell crossed the "firm line" of Fourth Amendment protection at the door of Rabb's house. Because the smell of marijuana had its source in Rabb's house, it was an "intimate detail" of that house, no less so than the ambient temperature inside Kyllo's house. Until the United States Supreme Court indicates otherwise, therefore, we are bound to conclude that the use of a dog sniff to detect contraband inside a house does not pass constitutional muster. The dog sniff at the house in this case constitutes an illegal search.
Next, we briefly address the dissent's attempt to differentiate Kyllo on the basis of the fact that it is concerned with the use of advanced technology by law enforcement. It is true that "the Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing a home on a public thoroughfare." Ciraolo, 476 U.S. at 213, 106 S.Ct. 1809. However, the use of enhancement to human senses often entails more than an unshielded glance at a house believed to obtain contraband. The use of dogs for investigation is a longstanding practice, but "the officers' use of a dog is not a mere improvement of their sense of smell, as ordinary eyeglasses improve vision, but is a significant enhancement accomplished by a different, and far superior, sensory instrument." Thomas, 757 F.2d at 1367. Likewise, "thermal imagers detect infrared radiation, which virtually all objects emit but which is not visible to the naked eye." Kyllo, 533 U.S. at 29, 121 S.Ct. 2038. Although a drug detector dog's sense of smell may not be manmade, electronic technology, like the Agema Thermovision 210, its use might allow law enforcement to detect that which it otherwise could not detect with unaided human senses. Relying on Kyllo, we conclude that although the use of such sensory enhancement techniques to detect contraband subsequently seized by warrant may not amount to a search in a place such as a public airport, it does when *1185 intruding into a house to discern "intimate details." See Payton, 445 U.S. at 586-587 n. 24, 100 S.Ct. 1371.
Before turning to the issue of whether there was yet probable cause to support the issuance of a search warrant for Rabb's house based on independent lawful evidence, we address Nelson v. Florida, 867 So.2d 534 (Fla. 5th DCA 2004). In Nelson, the defendant checked into a Holiday Inn in Palatka, and the hotel staff reported his presence to law enforcement because he matched a profile of drug dealers who used the hotel as a point of sale. Id. at 535. Law enforcement then used a trained canine to walk the halls of the hotel and perform drug sniffs of each door. Id. The canine alerted to the defendant's door, and law enforcement found cocaine inside the room. Id. The defendant filed a motion to suppress alleging that law enforcement violated the Fourth Amendment by employing "a sensory enhancing animal that was unable to detect contraband until it was within eighteen inches to three feet of the lower door jam[b]" of the hotel room. Id. The trial court denied the motion and the Fifth District affirmed. Id.
The court's rationale in Nelson is as follows. Despite the fact that hotel rooms are constitutionally-protected areas, individuals do not have a reasonable expectation of privacy in public areas outside a hotel room, such as hallways. Id. (citing Brant v. State, 349 So.2d 674 (Fla. 3d DCA 1977)). The court then went on to reject the defendant's Fourth Amendment argument and United States v. Thomas, 757 F.2d 1359 (2d Cir.1985). Nelson, 867 So.2d at 536-537. In so doing, the court cited federal precedent holding that:
"The fact that a dog, as odor detector, is more skilled than a human does not render the dog's sniff illegal. Just as evidence in the plain view of an officer may be searched without a warrant, evidence in the plain smell may be detected without a warrant."
Id. at 537 (quoting United States v. Roby, 122 F.3d 1120, 1124-1125 (8th Cir.1997) (internal citations omitted)).
For two main reasons, we conclude that Nelson neither controls nor conflicts with our decision in this case holding the dog sniff of Rabb's house to be violative of the Fourth Amendment. First, although we recognize and are in accord with the principle that "the occupants of a hotel room are entitled to the protection of the Fourth Amendment" to much the same degree as occupants of a house, this principle is not without its limitations. See Hoffa v. United States, 385 U.S. 293, 301, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). As the Fifth Circuit stated in United States v. Jackson, 588 F.2d 1046 (5th Cir.1979):
Despite the fact that an individual's Fourth Amendment rights do not evaporate when he rents a motel room, the extent of the privacy he is entitled to reasonably expect may very well diminish. For although a motel room shares many of the attributes of privacy of a home, it also possesses many features which distinguish it from a private residence: "A private home is quite different from a place of business or a motel cabin. A home owner or tenant has the exclusive enjoyment of his home, his garage, his barn or other buildings, and also the area under his home. But a transient occupant of a motel room must share corridors, sidewalks, yards, and trees with the other occupants. Granted that a tenant has standing to protect the room he occupies, there is nevertheless an element of public or shared property in motel surroundings that is entirely lacking in the enjoyment of one's home."
Id. at 1052 (quoting Marullo v. United States, 328 F.2d 361, 363 (5th Cir.1964)).
*1186 Put very simply, a hotel room may be nearly identical to a house for Fourth Amendment purposes, but it is not a house. It is neither as private nor as sacrosanct. As a result, the fact that the Fifth District held that a trained canine's dog sniff of a hotel room does not violate the Fourth Amendment because the hotel corridor is a public area, does not conflict with our conclusion that the dog sniff of a private house, such as Rabb's, violates the Fourth Amendment. This is so for the same reasons of "place" discussed above when determining that Place is not dispositive of this case, as it addressed public airports rather than private houses.
Second, the distinction between unaided and technologically-enhanced surveillance is not one without a difference as suggested in Nelson. The Fourth Amendment "protects conversations that cannot be heard except by means of artificial enhancement." United States v. Mankani, 738 F.2d 538, 543 (2d Cir.1984) (citation omitted). The Second Circuit explained the rationale behind this rule:
The reason for this is evident. The risk of being overheard is a given in modern life, and any time people speak to one another they necessarily assume that risk. "But as soon as electronic surveillance comes into play, the risk changes crucially. There is no security from that kind of eavesdropping, no way of mitigating the risk, and so not even a residuum of true privacy." Absent a warrant, this kind of investigative intrusion bypasses the safeguards of a neutral magistrate's predetermination of probable cause.
Id. at 543 (internal citations omitted).
Because of the similarities highlighted earlier in this opinion between the use of the thermal imager in Kyllo and the dog sniff in Rabb's case, it would be difficult to posit that the rationale of Mankani does not apply here. The risk of the odors of one's house being smelled by the neighbors may be a "given in modern life," but there is no way to mitigate the risk of using dog sniffs where law enforcement unaided might be unable to smell illegal drugs growing in a house. Just as an individual would never be able to soften his voice enough to mitigate the risk of intrusive surveillance, he would never be able to soften the smells of his house enough to avoid detection by the ultra-sensitive noses of dogs.
To reach any other conclusion recalls the disturbing use of robot-spiders (an emblem blending both the technological advances of Kyllo and the animal senses of Rabb) to detect fugitives who softened their identities by retinal transplantation in Minority Report (Dreamworks 2002), or similar scenarios in virtually any other dystopian science fiction film. After all, the fact that conduct in a house, such as growing marijuana, is not constitutionally protected, does not lessen the Fourth Amendment violation occurring when law enforcement uses sensory enhancement to intrude across the "firm line" at the door of a house and perceive its "intimate details." As a result, the Fifth District's decision in Nelson is neither dispositive nor in conflict.
Although the dissent claims that our analysis of Nelson does not mesh with our conclusion regarding the dog sniff at the door of Rabb's house, we do not believe that there is any inconsistency in our approach. Put simply, we view the reasonable expectation of privacy afforded to locations along a hierarchy from public to private. An airport and a highway are unquestionably public places with little or no privacy, as much as a home is undoubtedly a private place characterized by its very privacy. A hotel room lies somewhere in between, because although it possesses *1187 some of the aspects of a home, it also possesses some of the aspects of the itinerant life present in airports and on highways. An individual expects the public to be readily present in the hallways outside a hotel room door, but an individual does not expect the public to be readily present on the porch outside the door to a home.
It is axiomatic that evidence resulting from an illegal search cannot be the basis of probable cause supporting a subsequent search warrant. See State v. Morsman, 394 So.2d 408, 410 (Fla.1981) (citing Purcell v. State, 325 So.2d 83 (Fla. 1st DCA 1976)). Now that we have concluded that law enforcement's use of a drug detector dog at Rabb's door constituted an unreasonable and illegal search, we must consider whether any independent and lawfully obtained evidence establishes a substantial basis for concluding that probable cause existed to support the issuance of a search warrant for Rabb's house. See State v. Hunwick, 434 So.2d 1000, 1001 (Fla. 4th DCA 1983) ("The inclusion of illegally obtained evidence in the supporting affidavit, where the affidavit contains other valid allegations sufficient to establish probable cause, does not invalidate a search warrant. The trial court's duty is to excise the invalid allegations and determine whether the independent and lawfully obtained information demonstrates probable cause.") (internal citations omitted).
The probable cause affidavit listed three other evidentiary bases for probable cause: the information provided by the anonymous source, the cannabis cultivation books and video discovered during the traffic stop of Rabb's vehicle, and the cannabis located in Rabb's vehicle and on his person. The anonymous tip that there was a marijuana grow operation in Rabb's house did not establish a fair probability that illegal activity was occurring in Rabb's house. The tip was unverified because it came from an unknown individual rather than a qualified confidential informant. Nor was it corroborated in the probable cause affidavit by any evidence resulting from surveillance of the house. There was no indicium of the cultivation of marijuana within, such as covered windows, high pedestrian traffic, or higher than normal use of electricity.
The evidence found during the traffic stop of Rabb's vehicle, including that resulting from an unchallenged dog sniff, also does not provide sufficient probable cause for the search of his house. During the traffic stop, Rabb was found to be in possession of two cannabis cultivation books, one cannabis cultivation video, and a total of three cannabis cigarettes (one in his car and two in his shoe). The possession of a couple of books and a video discussing cannabis cultivation, which in and of itself was perfectly lawful and innocent, and a small amount of marijuana consistent with personal use[2] simply does *1188 not suggest a fair probability of any broader criminal activity, such as the growing of marijuana in Rabb's house. Thus, we agree with the trial court that no independent and lawfully obtained evidence establishes the probable cause necessary to support the issuance of a search warrant for Rabb's house in this case.
Considered in totality, neither the anonymous tip nor the fruits of the traffic stop (three cannabis cigarettes, two cannabis cultivation books, and one cannabis cultivation video), provided a substantial basis for concluding that probable cause existed to support the issuance of a search warrant for Rabb's house. Therefore, the issuance of the search warrant for Rabb's house was in error, because the warrant was tainted by the dog sniff of Rabb's house and there was no independent and lawfully obtained evidence that established probable cause to support the issuance of a search warrant for Rabb's house. Consequently, the evidence obtained from the search of Rabb's house was "fruit of the poisonous tree" subject to suppression by the trial court. See Wong Sun v. United States, 371 U.S. 471, 484-485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
In sum, we hold that the trial court did not err by granting Rabb's motion to suppress where the marijuana seized was discovered by a dog sniff at the exterior of his house. Based on the reasonable expectation of privacy recognized by both law and society to be associated with a house, law enforcement's use of the dog sniff without a warrant constituted a search that was not permitted by the Fourth Amendment. Furthermore, without the dog sniff of Rabb's house, there was no independent and lawfully obtained evidence establishing probable cause to issue a search warrant for Rabb's house. The lack of probable cause and the invalid search warrant irremediably tainted the evidence obtained by the search of Rabb's house. Overall, we conclude that even with great deference afforded to the search warrant for Rabb's house in this case, the probable cause affidavit did not provide a "substantial basis for concluding that probable cause existed." It included little more than bare conclusions and unfounded assumptions, so as to cross the line from the investigation of crime to the groundless intrusion upon privacy. As a result, we affirm the trial court's order granting the motion to suppress.
However, as directed by the United States Supreme Court on remand of our initial opinion, we engage in further consideration of this case in light of Illinois v. Caballes, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). See Florida v. Rabb, ___ U.S. ___, 125 S.Ct. 2246, 161 L.Ed.2d 1051 (2005). In Caballes, the Court was confronted with the question of "[w]hether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." 125 S.Ct. at 837. In reaching its holding that a reasonable, articulable suspicion is not required, the Court reasoned that:
[T]he use of a well-trained narcotics-detection dogone that "does not expose noncontraband items that otherwise would remain hidden from public view," Place, 462 U.S. at 707, 103 S.Ct. 2637during a lawful traffic stop, generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of *1189 respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement.
Id. at 838. The Court held: "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." Id. Our further consideration does not cause us to retreat from our original conclusion that the trial court's order granting the motion to suppress in this case should be affirmed. In the present case, the focus is not on the legitimacy of the traffic stop of Rabb's vehicle or the ensuing dog sniff of that vehicle, but rather on the subsequent unconstitutional dog sniff of Rabb's house.
Fourth Amendment jurisprudence has not developed in a vacuum, largely because in its protection of people from unreasonable searches and seizures by the government, the degree of protection to be afforded "requires reference to a `place.'" Katz, 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring). The answers to Fourth Amendment questions are highly "situation-sensitive," Caballes, 125 S.Ct. at 846 (Ginsburg, J., dissenting), because the situation provides the context necessary to determine whether an individual has a "constitutionally protected reasonable expectation of privacy." See Ciraolo, 476 U.S. at 211, 106 S.Ct. 1809. While Fourth Amendment decisions involve a myriad of other factors and guiding principles, it is the place and situation in which they arise that gives direction to judicial analysis.
In the present case, there are significant place and situation differences from Caballes. The challenged dog sniff occurred at the exterior of Rabb's house, the most sacred of places under Fourth Amendment jurisprudence. To repeat, the Fourth Amendment draws "a firm line at the entrance to the house." Payton, 445 U.S. at 589, 100 S.Ct. 1371. Caballes, on the other hand, does not involve a house, but rather a vehicle lawfully stopped by law enforcement while traveling along a public interstate highway. 125 S.Ct. at 836. Throughout the history of the Fourth Amendment, vehicles on public roads have not been granted the deference afforded to houses for several reasons: the ready mobility of vehicles, the fact that the interiors of vehicles are generally in plain view of those passing by, and the reality of "pervasive regulation" of vehicles by government, all of which result in a decreased expectation of privacy. See California v. Carney, 471 U.S. 386, 390-392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). The case on which Caballes principally relies, United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), also does not involve a house. Rather, it involves luggage in an airport, another public place. Place, 462 U.S. at 699, 103 S.Ct. 2637. Without doubt any protection of luggage in such a public location has been eroded to nearly the point of non-existence in a post-9/11 world. The individual's expectation of privacy could not be more minimal in today's airports with their luggage screenings, passenger scans, and patdown searches.
Juxtaposed against the realities of travel by car and plane, the house stands strong and alone, shrouded in a cloak of Fourth Amendment protection. A house is not movable or on display to the public (at least as far as its interior). The interior of the house is not pervasively regulated by government. If the Fourth Amendment has any meaning at all, a dog sniff at the exterior of a house should not be permitted to uncloak this remaining bastion of privacy, this most sacred of places under Fourth Amendment jurisprudence.
*1190 To this end, we re-emphasize our discussion of Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). In that discussion, we stress that the nature of what the dog detectswhether phrased as the quality or quantity of information or the presence or absence of contrabandis not the focus of Fourth Amendment concern. The Fourth Amendment concern is that the government endeavored at all to employ sensory-enhancing methods to cross the firm line at the entrance of a house. Id. at 593, 100 S.Ct. 1371. Once that line is violated by a dog's nose or a thermal imager, it brings an onslaught of prying government eyes in its wake, and the formerly intimate details of that house become open to public display. This reality, in which other intimate and fully legal details of an individual's life could be revealed, again sets the present case apart from Caballes and Place. Vehicles on public roadways and luggage in airports are simply different because the privacy to be invaded by government's prying eyes is necessarily limited by the size of the vehicle or bag, plus only the effects of one's traveling life chosen to appear outside the home and in public are at risk of exhibition. Once again, the risks to privacy are greatest at the threshold of the house; what may be tolerable on a public roadway or in an airport may not necessarily be countenanced at home. After all, "[i]n the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes." Kyllo, 533 U.S. at 37, 121 S.Ct. 2038. In sum, the distinguishing feature between Kyllo and Caballes is that Kyllo involved a search of a private house, but Caballes involved a search of a vehicle lawfully stopped on a public street. The constitutionally-suspect dog sniff in this case involved the visibly unattainable interior of a private house rather than a vehicle lawfully stopped on a public street, further demonstrating that the outcome of the case at bar is controlled by Kyllo.
The dissent interprets Caballes much like it interprets Place, to stand for the proposition that a binary search, which reveals only the presence or absence of contraband, is never a search for purposes of the Fourth Amendment. This analysis is flawed and disturbing for two reasons. The first reason highlights the fundamental philosophical divide between the majority and the dissent in this casein order to determine whether a search has occurred, we determine whether the place at which the search occurred was subject to a legitimate expectation of privacy while the dissent measures whether the item searched for was subject to a legitimate expectation of privacy. It is clear from the jurisprudential history of the Fourth Amendment that it is always considered in reference to a place. Furthermore, a slippery slope portends peril for privacy if the item searched for is the measuring stick. If determining whether law enforcement conduct constitutes a search is solely a function of whether the item searched for is illegal, whether that item be in a vehicle on a public highway or beyond the closed doors of an individual's castle, the Fourth Amendment is rendered meaningless. Nothing would deter law enforcement from marching a dog up to the doors of every house on a street hoping the dog sniffs drugs inside. If drugs are detected, then no search has occurred because there is no legitimate expectation of privacy in drugs and the Fourth Amendment is not implicated; if drugs are not detected, then law enforcement cannot charge the individual with a crime and the unfounded search goes undeterred. Such an "ends justifies the means" approach to the Fourth Amendment is simply not what the Founders intended when they embodied a barrier *1191 at the door of the home in the Fourth Amendment.[3]
Second, although we do not dispute the dissent's citation to cases holding that items in the plain sight or plain smell of law enforcement officers on a front porch are not subject to a legitimate expectation of privacy, such visual or olfactory observation is drastically different from employing sensory-enhancing technology on a front porch to reach through the door of a house to seek knowledge of sights and smells that might otherwise be undetectable to the naked eyes and noses of a human being. This dichotomy has been recognized by courts:
Generally, one does not have a privacy interest in what is voluntarily exposed to the public. No search occurs, and the protections of [the Fourth Amendment] are not implicated, when a law enforcement officer is able to detect something by using one or more of his senses while lawfully present at a vantage point. The protections of [the Fourth Amendment] are triggered only when a person's private affairs are disturbed or the person's home invaded.
Washington v. Carter, 151 Wash.2d 118, 85 P.3d 887, 890-891 (2004).
Furthermore, it is axiomatic that it is law enforcement's responsibility to include the information necessary to demonstrate probable cause in a probable cause affidavit in order to support the issuance of a search warrant. For reasons discussed throughout this opinion, we simply conclude that this case is unlike those cited by the dissent, in part due to insufficiencies in the probable cause affidavit. First, because the chronology of the probable cause affidavit suggests that the dog alert to marijuana occurred prior to law enforcement's detection of its odor, we cannot assume that law enforcement detected the odor of marijuana before the dog alerted as suggested by the dissent. As such, this is not a case in which a law enforcement officer used his senses to detect something within his plain smell; rather, a law enforcement officer used enhanced, animal senses to detect something inside a home that he might not otherwise have detected. Second, the probable cause affidavit does not support the conclusion that Chevy was trained to detect only contraband. In the probable cause affidavit, Chevy is described as a "drug detector dog" without more. There is no statement that he was "well-trained" or a description of his qualifications, experience, or reliability.[4] In *1192 Caballes, the dog was at least described as a "well-trained narcotics-detection dog," a fact distinguishable from the case at bar. 125 S.Ct. at 838.
Our conclusion that the motion to suppress was properly granted in this case is not a novel departure from the precedent of the United States Supreme Court, by which this Court is bound under Article I, Section 12 of the Florida Constitution, and its legacy of heightened protection of the home. The holdings in Caballes and Place may be based on what the dog detects, but the dog sniffs in those cases occurred in very different places from the house in the present case. The United States Supreme Court has yet to address the intersection of the logic of Caballes and Place with the historical protection of the home and Kyllo. Just as Kyllo did not pass on the constitutional permissibility of thermal scans of vehicles, Caballes did not pass on the constitutional permissibility of dog sniffs of houses. See Caballes, 125 S.Ct. at 842 (Souter, J., dissenting) ("The Court today does not go so far as to say explicitly that sniff searches by dogs trained to sense contraband always get a free pass under the Fourth Amendment, since it reserves judgment on the constitutional significance of sniffs assumed to be more intrusive than a dog's walk around a stopped car.").[5] In a "situation-sensitive" Fourth Amendment world, this is all the difference.
Upon consideration of Caballes, we reaffirm the trial court's order granting Rabb's motion to suppress. In this case, unlike Caballes, the intrusion on privacy expectations does rise to the level of a "constitutionally cognizable infringement." At the end of the analysis, the Fourth Amendment remains decidedly about "place," and when the place at issue is a home, a firm line remains at its entrance blocking the noses of dogs from sniffing government's way into the intimate details of an individual's life. If that line should crumble, one can only fear where future lines will be drawn and where sniffing dogs, or even more intrusive and disturbing sensory-enhancing methods, will be seen next.
Affirmed.
FARMER, J., concurs.
GROSS, J., dissents with opinion.
GROSS, J., dissenting.
I dissent from both the court's panel opinion and from the decision to deny rehearing *1193 en banc.[6]
This court is required by the Florida Constitution to construe the right against unreasonable searches and seizures "in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court." Art. I, § 12, Fla. Const. In two cases, the United States Supreme Court has held that dog sniffs of (1) luggage in an airport or (2) of the exterior of a car during a traffic stop are not a search under the Fourth Amendment. This authority compels the conclusion that a dog sniff from another location similarly open to the public is not a search.
The majority's opinion relies primarily on Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), to affirm the order granting the motion to suppress. Kyllo did not concern a dog sniff. The majority's constitutional analysis can be boiled down to this: because a house is neither luggage in an airport nor a car by the side of the road, a dog sniff at the front door of a house is a Fourth Amendment search.
Neither of the Supreme Court's dog sniff cases turns on the location of the sniff. Both cases are based on the unique nature of the canine nose.
To adopt the majority's view is to reject Supreme Court precedent and create a novel Fourth Amendment rule that the location of a dog sniff determines its propriety. The Florida Constitution prohibits this type of freewheeling jurisprudence. The United States Supreme Court has never created a residence exception to its Fourth Amendment dog sniff cases. This court's affirmance of the motion to suppress is an example of the humble tail wagging the constitutional dog.
A second problem with the majority opinion is that, in its eagerness to decide the dog sniff issue, the majority has turned up its nose to precedent by refusing to acknowledge that, without the dog sniff, the information supplied to the issuing magistrate in the warrant affidavit provided a substantial basis for concluding that probable cause existed. See Schmitt v. State, 590 So.2d 404, 409 (Fla.1991).

The Movement of the Dog and Detectives to the Front Door of the Residence did not Violate the Fourth Amendment
No Fourth Amendment violation occurred when the detectives and the dog went to the front door of Rabb's residence, which was accessible from the street. Based upon a clear line of precedent, the space in front of the door enjoyed no constitutional protection.
The Fourth Amendment does not necessarily protect areas of a home which are "open and exposed to public view." State v. Duhart, 810 So.2d 972, 973 (Fla. 4th DCA 2002); see also California v. Ciraolo, 476 U.S. 207, 213-14, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).
Moreover, "one does not harbor an expectation of privacy on a front porch where salesmen or visitors may appear at any time." State v. Morsman, 394 So.2d 408, 409 (Fla.1981); see also Fla. Dep't of Agric. & Consumer Servs. v. Haire, 836 So.2d 1040, 1055 n. 7 (Fla. 4th DCA 2003) (noting that an unfenced front yard is generally not considered protected by the Fourth Amendment due to the "lack of expectation of privacy in what is visible to the entire public"); Wysong v. State, 614 *1194 So.2d 670, 671 (Fla. 4th DCA 1993) (finding that an "unfenced front yard was equivalent to an open field through which the officer passed to get to the threshold front door"); Koehler v. State, 444 So.2d 1032, 1033 (Fla. 1st DCA 1984) (determining that an unenclosed front porch is unprotected by the Fourth Amendment); State v. Detlefson, 335 So.2d 371, 372 (Fla. 1st DCA 1976) ("It cannot be said that defendant had a reasonable expectation of privacy in the front porch of his home where, presumably, delivery men and others were free to observe the plants thereon.").
Nothing, then, prohibited the detectives from walking up to Rabb's front door. Without violating the Fourth Amendment, a police officer may approach and knock on a suspect's front door, in an attempt to speak to the suspect. See Potts v. Johnson, 654 So.2d 596, 599 (Fla. 3d DCA 1995).
Here, the front door of the residence was on a direct path from the public street, about twenty or thirty feet in. As the dog and the detectives stood at the front door, prior to inhaling, there was no constitutional violation.

The Detectives' Detection of the Odor of Cannabis, Combined With Other Factors, Provided a Substantial Basis for Issuing the Warrant, Without Considering the Dog Sniff
Even without considering the dog sniff, there was a sufficient factual basis for the warrant to issue.
According to the warrant affidavit, the drug dog "walked from the public roadway in front of the residence, up to the front door and alerted ... Furthermore, Sgt. Damiano and Det. Taranu walked to the front door of the residence and could smell the odor of cannabis emitting from the residence."
The majority strains to discredit the fact of the officers' olfactory observations by characterizing the case as one where "a law enforcement officer used enhanced, animal senses to detect something inside a home that he might not otherwise have detected."
There is nothing in the record to support this hypothesis. The affidavit says what it says. At the hearing on the motion to suppress, Detective Taranu was not questioned about what he smelled. He testified that once he "saw the path ... going from the door to the street" and noticed "the wear and tear on the grass," he "positioned" himself and "push[ed] the dog towards the front door, taking the same path any normal person would take to go."
Although the majority has correctly stated the standard of review of a search conducted pursuant to a warrant, it has failed to follow that standard. Courts' after-the-fact scrutiny of a warrant affidavit should not take the form of de novo review. See Massachusetts v. Upton, 466 U.S. 727, 732-33, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984). As the Supreme court wrote in Upton,
"A grudging or negative attitude by reviewing courts toward warrants," United States v. Ventresca, 380 U.S. 102, 108 [85 S.Ct. 741, 13 L.Ed.2d 684] (1965), is inconsistent both with the desire to encourage use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case.
Id. at 733, 104 S.Ct. 2085. The Supreme Court has adopted a deferential standard of review of warrant affidavits, "to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." Id. The deferential standard *1195 asks whether the magistrate had "a substantial basis for concluding that a search would uncover evidence of wrongdoing." Schmitt, 590 So.2d at 409.
Under this deferential standard, a reviewing court confines its inquiry "entirely to the four corners of the affidavit."[7]Id.; Pagan v. State, 830 So.2d 792, 806 (Fla. 2002). A warrant affidavit should be interpreted in a "common sense [] manner," not a "hypertechnical" one. U.S. v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). The Supreme Court has explained the reason for this approach to reviewing warrant affidavits:
[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.
Id. at 108, 85 S.Ct. 741. The job of an appellate court is not to nitpick a warrant affidavit.
Instead of reading the affidavit in a common sense manner, the majority has hypertechnically construed the facts in the light most favorable to its desired result.
Under the correct standard of review, the officers smelled the odor of marijuana on the front step of the home. "Just as evidence in the plain view of officers may be searched without a warrant, evidence in the plain smell may be detected without a warrant." Nelson v. State, 867 So.2d 534, 537 (Fla. 5th DCA 2004) (citations omitted). There is no residence exception to the plain view/plain smell doctrine. The plain view doctrine provides that items in plain view in a residence may be seized when "(1) the seizing officer is in a position where he has a legitimate right to be, (2) the incriminating character of the evidence is immediately apparent, and (3) the seizing officer has a lawful right of access to the object." Pagan, 830 So.2d at 808-09.
The supreme court has held that officers' detection of the odor of "previously burnt marijuana certainly warranted a belief that an offense had been committed" and provided the officers with probable cause to not only stop a vehicle, but to search the entire passenger compartment. State v. Betz, 815 So.2d 627, 633 (Fla.2002); see also State v. T.P., 835 So.2d 1277 (Fla. 4th DCA 2003) (court held that odor of marijuana justified officer's detention and search of defendant and his car); State v. K.V., 821 So.2d 1127 (Fla. 4th DCA 2002) (same).
The detectives' detection of the odor of marijuana in this case bears similar evidentiary import; "the odor of cannabis emitting from the residence" supported the detectives' belief that the residence contained contraband.
No Florida court has ever held that an officer's smelling of marijuana at the front door of a residence is a Fourth Amendment search that requires a warrant.
*1196 In State v. Drysdale, 770 So.2d 301 (Fla. 4th DCA 2000), an officer responding to a 911 call spoke to the potential victim "at her open front door," where he "noticed the smell of marijuana." We upheld the seizure of marijuana seeds from the living room floor, holding that "where the odor of marijuana was apparent" and the officer observed seeds on the carpet, the officer was justified in the "belief that the seeds were contraband." Id. at 303. Significantly, we did not hold that the officer's sniff amounted to an unlawful search. See State v. Garcia, 374 So.2d 601, 602-03 (Fla. 3d DCA 1979) (holding that officers smelling "the odor of marijuana smoke" at the front door of a residence was one factor supporting a finding of probable cause); accord Amburn v. State, 701 So.2d 568, 569 (Fla. 2d DCA 1997).
Here, the detectives swore in the affidavit that they noticed the "odor of cannabis emitting from the residence." The detectives' noses were hardly the type of "technologically-enhanced surveillance" tool that bothers the majority. The odor of cannabis from a residence has at least the same evidentiary import as the same odor emitting from a car. This was not a case where the warrant issued based on odor alone. When combined with the other factors in the case, there was more than a substantial basis for the magistrate to conclude that probable cause existed. The probable cause equation is: officer's detection of odor of cannabis from residence + anonymous tip that residence contained a "cannabis grow operation" + defendant exiting from residence + cannabis cultivation video and two cannabis cultivation books on driver's seat of defendant's car + recovery of cannabis cigarette from ashtray of defendant's car = probable cause to believe that the residence contained contraband.
The majority's refusal to acknowledge the evidentiary import of the officers' olfactory observation has turned the sense of smell into the stepchild of the senses when it comes to Fourth Amendment analysis. In this district, an officer lawfully at the front door of a residence may act on what he sees, hears, feels, and tastes, but not on what he smells. The officer may not take action based on the smell of smoke, he must wait until he sees the flames. The majority's refusal to take the officers' observation into consideration conflicts with both Drysdale and Garcia, where the odor of cannabis was a proper factor in the probable cause equation.[8]

Under United States v. Place, United States v. Jacobsen and Illinois v. Caballes, a Dog Sniff of Contraband is Not a Fourth Amendment Search
Since Chevy stood on constitutionally unprotected ground at the moment of his sniff, the next question is whether the dog's alert to the odor of contraband wafting from the residence constituted a search violative of the Fourth Amendment.
*1197 In United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court held that a canine sniff of the contents of closed luggage was not a Fourth Amendment "search." The Court wrote:
The purpose for which respondent's luggage was seized, of course, was to arrange its exposure to a narcotics detection dog. Obviously, if this investigative procedure is itself a search requiring probable cause, the initial seizure of respondent's luggage for the purpose of subjecting it to the sniff test  no matter how brief  could not be justified on less than probable cause.
Id. at 706, 103 S.Ct. 2637.
The Supreme Court's holding in Place was clear that the canine sniff was not a "search."
[W]e conclude that the particular course of investigation that the agents intended to pursue here  exposure of respondent's luggage, which was located in a public place, to a trained canine  did not constitute a "search" within the meaning of the Fourth Amendment.
Id. at 707, 103 S.Ct. 2637.
Central to the Supreme Court's conclusion that a canine sniff was not a search was its uniquely narrow scope:
[T]he sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited....
In these respects, the canine sniff is sui generis. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.
Id. The Supreme Court's recognition that a dog sniff is "sui generis" renders that investigative technique unique in Fourth Amendment jurisprudence.
The majority misreads Place when it asserts that "[t]he function of `place' in Fourth Amendment jurisprudence was instrumental in the decision in Place." The majority erroneously suggests that the "feared injury" in this case is that "law enforcement endeavored to obtain information from inside the house at all."
There is no legal distinction between officers in an airport with the suspect's luggage, as in Place, and the officers and dog at the front door of Rabb's residence in this case. The Fourth Amendment did not preclude the officers in either case from being where they were when the canine sniff took place.
Decided a year after Place, United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), provides a fuller rationale for why a narrowly focused investigative technique, one that reveals only the presence or absence of contraband, is not a Fourth Amendment "search."
Jacobsen pointed out that the Fourth Amendment provides protection against "unreasonable searches and seizures." The Supreme Court defined a Fourth Amendment search: a "`search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." Id. at 113, 104 S.Ct. 1652.
In Jacobsen, government agents had seized some white powder belonging to the defendants. They subjected a sample of the powder to a field test for cocaine. The issue before the Supreme Court was whether the field test of the defendants' property constituted a "search." The field test infringed on the defendants' subjective expectation of privacy. However, the Supreme Court identified the critical issue as *1198 being whether that expectation of privacy was one that "society is prepared to recognize as reasonable." Id. at 122, 104 S.Ct. 1652. Jacobsen characterized a protected expectation of privacy as one that is "legitimate":
A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.... It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised.... Congress has decided  and there is no question about its power to do so  to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguable "private" fact, compromises no legitimate privacy interest.
Id. at 123, 104 S.Ct. 1652. The Supreme Court observed that its holding in Jacobsen was "dictated" by its ruling in Place; the Court referred to Place's holding that "a `sniff test' by a trained narcotics detection dog was not a `search' within the meaning of the Fourth Amendment." 466 U.S. at 123, 104 S.Ct. 1652.
After the holdings of Place and Jacobsen, Florida courts consistently ruled that a canine sniff for contraband does not constitute a Fourth Amendment search. For example, we held that a dog sniff of a vehicle was permissible because "its limited scope and method of investigation does not constitute a search." Flowers v. State, 755 So.2d 708, 710 (Fla. 4th DCA 1999) (quoting Daniels v. Cochran, 654 So.2d 609, 613 (Fla. 4th DCA 1995)); Castro v. State, 755 So.2d 657, 659 (Fla. 4th DCA 1999). "Just as no police officer need close his eyes to contraband in plain view, no police officer armed with a sniff dog need ignore the olfactory essence of illegality." State v. Hill, 770 So.2d 280, 282 (Fla. 5th DCA 2000). Furthermore, Florida courts have held that a drug dog alert of a vehicle provides probable cause for a search. See Bain v. State, 839 So.2d 739, 740 (Fla. 4th DCA 2003); Hill, 770 So.2d at 282; State v. Robinson, 756 So.2d 249, 250-51 (Fla. 5th DCA 2000).
That Florida ruled correctly on these canine sniff issues became apparent after Illinois v. Caballes, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). Caballes did not change the analysis of Place and Jacobsen.
Caballes involved the dog sniff of the exterior of a car during a traffic stop. See Caballes, 125 S.Ct. at 843. The Supreme Court assumed that "the officer conducting the dog sniff had no information about [the defendant] except that he had been stopped for speeding." Id. at 837. The duration of the traffic stop was not longer than the time reasonably required to issue a warning ticket for the speeding infraction. See id.
The Supreme Court held that a "dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." Id. at 838. The Court reasoned that a well-trained narcotics detection dog will alert only to the presence of contraband, in which there is no legitimate privacy interest, and not to "`noncontraband items that otherwise would remain hidden from public view.'" Id. (quoting Place, 462 U.S. at 699, 103 S.Ct. 2637).
The Court distinguished Caballes from Kyllo which involved the use of a thermal-imaging device to detect the growth of marijuana in a home. Crucial in Kyllo "was the fact that the device was capable *1199 of detecting lawful activity," unlike a trained dog. Caballes, 125 S.Ct. at 838. Contrary to the majority's contention, Caballes does not turn on the location where a dog sniff occurs.
The majority fails to grasp the importance of the two concepts central to Place, Jacobsen, and Caballes. There is no legitimate expectation of privacy in the odor of contraband; a well-trained dog will alert only to contraband, and not to odors or other things protected by the Fourth Amendment. This is not a case where the defendant challenged the dog's training or experience.[9] The majority's misunderstanding is evident from the statement that the "dog's sense of smell crossed the `firm line' of Fourth Amendment protection at the door of Rabb's house." Rather, it was the constitutionally unprotected odor of contraband that crossed the threshold of the home to the dog's nose, which sniffed from a place open to the public.

The Holding of United States v. Place, Controls This Case Even Though the Dog Sniff Occurred at a Private Residence
The next question is whether this case differs from Place and Caballes because it involves not luggage or a vehicle, but a canine sniff at the front door of Rabb's home.
It is true that individuals are afforded a greater expectation of privacy in their home as compared to a vehicle. See State v. McLeod, 664 So.2d 983, 985 (Fla. 4th DCA 1995). However, as Judge Charles Moylan has succinctly written:
The higher level of justification required to satisfy the Fourth Amendment when it applies ... is not to be confused with the very different issue of whether the amendment applies. Even the enhanced protection of the home is still limited to being a protection against "unreasonable searches and seizures." It is not a protection against non-searches and non-seizures, reasonable or unreasonable.
Fitzgerald v. State, 153 Md.App. 601, 837 A.2d 989, 1030 (2003), aff'd, 384 Md. 484, 864 A.2d 1006 (2004).
Even though Place and Caballes did not involve a dog sniff at a residence, "the rationale of Place and of Jacobsen ... had absolutely nothing to do with the locus either 1) of where the dog sniffing took place or 2) of where the subjective expectation of privacy was being entertained." Id. As Judge Moylan has observed:
The raison d'etre for treating a dog sniff as a non-search is that the binary nature *1200 of its inquiry, "contraband `yea' or `nay'?," precludes the possibility of infringing any expectation of privacy that society objectively considers to be legitimate. If the possession of narcotics in an automobile or a suitcase is illegitimate, so too is the possession of narcotics in a home. It is the criminal nature of the possession itself that takes the activity out from under the protection of the Fourth Amendment, not the place where the possession occurs.
Id.
The majority and the circuit court relied on United States v. Thomas, 757 F.2d 1359 (2d Cir.1985), to find the dog sniff was a search under the Fourth Amendment. In Thomas, the second circuit held that a dog sniff of odors emanating from a residential apartment constituted a Fourth Amendment search. The court distinguished Place, reasoning that:
Here the defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be "sensed" from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation. The Supreme Court in Place found only "that the particular course of investigation that the agents intended to pursue here  exposure of respondent's luggage, which was located in a public place to a trained canine  did not constitute a `search' within the meaning of the Fourth Amendment." Place, 103 S.Ct. at 2644-45. Because of defendant Wheeling's heightened expectation of privacy inside his dwelling, the canine sniff at his door constituted a search.
Thomas, 757 F.2d at 1367.
The problem with Thomas is that it is unsound; the opinion "has met with the universal disapprobation of all the federal circuit and district courts that have considered it." Fitzgerald, 837 A.2d at 1031; See also United States v. Reed, 141 F.3d 644, 649-50 (6th Cir.1998) (stating that Thomas ignored the Supreme Court's determination in Place that a person has no legitimate expectation of privacy in the possession of contraband, "thus rendering the location of the contraband irrelevant to the Court's holding that a canine sniff does not constitute a search"); United States v. Roby, 122 F.3d 1120, 1125 (8th Cir.1997) (finding that a dog sniff of a common hotel corridor was not a search); United States v. Lingenfelter, 997 F.2d 632, 639 (9th Cir.1993) (reasoning that Thomas conflicts with Supreme Court authority and "rests on an incorrect statement of law"); United States v. Colyer, 878 F.2d 469, 474-76 (D.C.Cir.1989) (determining that the appellant's reliance of the Thomas decision was unavailing and noting the case's correctness has been "called into question"); United States v. Hogan, 122 F.Supp.2d 358, 369 (E.D.N.Y.2000) (following Thomas, but commenting that the case "appears to be at odds with Place and Jacobsen"); United States v. Sklar, 721 F.Supp. 7, 14 (D.Mass.1989) (observing that a "dwelling-like" expectation of privacy "is not justified when it is asserted with respect to contraband"); People v. Dunn, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1056-57 (1990) (holding that canine sniff is not a search under the Fourth Amendment); State v. Smith, 327 Or. 366, 963 P.2d 642, 647 (1998) (observing that Thomas "would appear to be questionable law"); Rodriguez v. State, 106 S.W.3d 224, 228-29 (Tex.App.2003) (same); Porter v. State, 93 S.W.3d 342, 346-47 (Tex.App.2002) (same); United States v. Tarazon-Silva, 960 F.Supp. 1152, 1162-63 (W.D.Tex.1997) (holding that a dog sniff of the dryer vent of house was not a search).
For example, in Colyer, the Court of Appeals for the District of Columbia challenged Thomas's reasoning:

*1201 As an initial matter, the very correctness of the Thomas decision is called into question by its assertion that the defendant "had a legitimate expectation that the contents of his closed apartment would remain private." As was shown above, the Supreme Court's analyses in Place and Jacobsen indicate that a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed. No legitimate expectation of privacy is impinged by governmental conduct that can "reveal nothing about noncontraband items."
Colyer, 878 F.2d at 475 (citations omitted).
In Colyer, the court determined that the canine "sniff of the exterior of an Amtrak roomette" was not a Fourth Amendment search. Id. at 473. The opinion emphasized the limited and binary nature of the canine inquiry:
As in Place, the driving force behind Jacobsen was the recognition that because of the binary nature of the information disclosed by the sniff, no legitimately private information is revealed: That is, "the governmental conduct could reveal nothing about noncontraband items."
. . .
In our view, then, Place and Jacobsen stand for the proposition that a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed. Stated otherwise, governmental conduct that can "reveal nothing about noncontraband items" interferes with no legitimate privacy expectation.
Id. at 474 (citations omitted).
We should align ourselves with the majority of courts that have considered the issue and hold "that a sniff by a trained dog, standing where it has a right to be, of odors emanating from any protected place, residence or otherwise, is not a search within the meaning of the Fourth Amendment." Fitzgerald, 837 A.2d at 1035.
The majority concludes that Kyllo controls the outcome in this case, accepting Rabb's argument that Kyllo has "re-emphasized the sanctity and expectation of privacy of the home."
Kyllo is distinguishable because the investigative technique there at issue was not the limited one so central to the holdings of Place, Jacobsen, and Caballes.
In Kyllo, the police used a thermal imaging device to detect that unusual amounts of heat were being generated inside a home, a "phenomenon that is not itself criminal and could well have been a non-criminal explanation." Fitzgerald, 837 A.2d at 1036. The surveillance device was "a sophisticated piece of technology that revealed information, other than the presence of contraband, about the interior of Kyllo's home." Wilson v. State, 98 S.W.3d 265, 272 (Tex.App.2002). As the Supreme Court pointed out, the surveillance device "might disclose ... at what hour each night the lady of the house takes her daily sauna and bath...." Kyllo, 533 U.S. at 38, 121 S.Ct. 2038. The thermal imaging device was not limited to discovering the presence or absence of contraband drugs.
Unlike the Kyllo thermal imaging device, the dog sniff here disclosed only the presence or absence of narcotics; it did not "expose noncontraband items, activity, or information that would otherwise remain hidden from public view." Rodriguez, 106 S.W.3d at 229.
A second distinction between this case and Kyllo is Kyllo's concern with "the advance of technology," the "power of technology to shrink the realm of guaranteed privacy," and "technology [that] is not in general public use." 533 U.S. at 34, 121 S.Ct. 2038. Fitzgerald's discussion of this aspect of Kyllo is apposite:

*1202 Kyllo's fear was that the failure to prohibit thermal imaging "would leave the homeowner at the mercy of advancing technology  including imaging technology that could discern all human activity in the home." The concern was not so much with present investigative capability but with "more sophisticated systems that are already in use or in development," as Kyllo predicted that the "ability to `see' through walls and other opaque barriers is a clear, and scientifically feasible, goal of law enforcement research and development."
Fitzgerald, 837 A.2d at 1037 (citations omitted).
The canine sense of smell is not the type of rapidly advancing technology that concerned the Supreme Court in Kyllo. As Judge Moylan has observed:
Bloodhounds have been chasing escaping prisoners and other fugitives through the swamps for hundreds of years, with posses following dutifully and trusting implicitly in the canine expertise, even at the closed doors of cabins and houses. The canine reactions, moreover, have traditionally been admissible as evidence even at a trial on the merits, let alone in an ex parte application for a warrant.
The use of the sense of smell generally is a familiar tool of perception much older than the common law or the Bill of Rights. Indeed, Blair v. Commonwealth, 181 Ky. 218, 204 S.W. 67, 68 (Ky.1918), stated that bloodhound evidence "was looked upon with favor as early as the twelfth century," as it related a declaration of King Richard I of England (1189-1199), "Dress yonder Marquis [who had stolen the banner of England] in what peacock robes you will, disguise his appearance, alter his complexion with drugs and washes, hide him amidst a hundred men; I will yet pawn my scepter that the hound detects him." It is hardly a new or unfamiliar investigative modality.
Fitzgerald, 837 A.2d at 1037.
Nothing in Kyllo compels the conclusion that Chevy's sniff at the door of the residence was a search under the Fourth Amendment. The Court did not recede from Place and Jacobsen.
Rather then ride roughshod over precedent, the majority's concern for the privacy of a home is better addressed by holding that a dog sniff alone will not support the issuance of a search warrant for a residence. Such a holding would require law enforcement to discover additional facts, as it did in this case, before a warrant can issue.
Other courts that have expressed concern about extending the holding of Place to private residences have tempered it by imposing a requirement that the use of the "canine cannabis connoisseurs" (People v. Dunn, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1055 (1990)) (quoting 1 LAFAVE, SEARCH AND SEIZURE § 2.2(f), at 367 (2d ed. 1987)) be supported by a reasonable suspicion that contraband is present. See United States v. Whitehead, 849 F.2d 849, 858 (4th Cir.1988), abrogated on other grounds by Gozlon-Peretz v. United States, 498 U.S. 395, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991); McGahan v. State, 807 P.2d 506, 509-10 (Alaska Ct.App.1991); State v. Ortiz, 257 Neb. 784, 600 N.W.2d 805, 807 (1999). Under these cases, reasonable suspicion existed in this case based on the tip, the officers' detection of the odor of cannabis, and the discovery of marijuana cultivation books and cannabis in Rabb's car.
Finally, the majority opinion struggles at length to distinguish Nelson v. State, 867 So.2d 534 (Fla. 5th DCA 2004). Seven words summarize the majority's reasoning: *1203 [A] hotel room is not a house. The majority thus avoids conflict by creating an exception to Place and Caballes. However, one has an expectation of privacy in a hotel room similar to that in a home. Both a hotel hallway and front doorstep are open to the public. The dog sniff in each case should be judged by the same standards. No other area of Fourth Amendment law is as schizophrenic as the majority has made this one. What is good for the home should be good for the Hilton.
The issuing magistrate properly considered the canine sniff in deciding to issue the warrant. Even without the dog sniff, a substantial basis for the magistrate's finding of probable cause existed. This court should reverse the circuit court order suppressing the fruits of the search.
NOTES
[1] The reader will notice that Rabb was referred to as John Brown in the Affidavit and Application for a Search Warrant. There is no dispute that John Brown is the same individual as James Rabb.
[2] See State v. Johnson, 6 Neb.App. 817, 578 N.W.2d 75, 82-83 (1998) ("It has been held that the arrest of a defendant's alleged roommate, pursuant to a vehicle stop, for possession of a large quantity of cocaine on her person did not provide probable cause to search the defendant's residence at a later time. See United States v. Stout, 641 F.Supp. 1074 (N.D.Cal.1986). It has also been held that there was no probable cause for the issuance of a search warrant for a defendant's home based on the defendant's arrest, pursuant to a vehicle stop a few hours earlier, on a drug possession charge, even though cocaine found in the defendant's vehicle was in a quantity greater than for personal use. See Minnesota v. Kahn, 555 N.W.2d 15 (Minn. App.1996). Compare State v. Godbersen, 493 N.W.2d 852 (Iowa 1992) (holding that where drugs found in car were packaged to indicate person is involved in drug dealing there existed reasonable belief that person kept drugs, weighing and measuring devices, packaging materials, and profits at residence). It has been observed that if mere probable cause to arrest a suspect also established probable cause to search the suspect's home, there would be no reason to distinguish search warrants from arrest warrants. United States v. Lucarz, 430 F.2d 1051 (9th Cir.1970).").
[3] In fact, the tension between the majority and dissent is representative of a tension recognized to be at the heart of the recent Fourth Amendment jurisprudence of the United States Supreme Court: "The binary search doctrine of Place and Caballes fits somewhat uncomfortably with Kyllo. Kyllo confirmed that if information is gathered constitutionally, reasonable inferences made from that data are inherently constitutional. Caballes indicates that if the process of inferring reveals only information that is not considered private (particularly evidence of illegal activity), then there are no constitutional limits on the scope of data that can be collected. These two holdings are not mutually exclusive, but neither do they sit perfectly well with one another in spirit." Fourth AmendmentCanine Sniff, 119 Harv. L. Rev. 179, 188 (Nov. 2005).
[4] Several cases from across the country suggest that such a probable cause affidavit is insufficient and require law enforcement to provide information about the dog's training, experience, and reliability. See, e.g., United States v. Jackson, 2004 WL 1784756, at *3 n.1 (S.D.Ind.2004) (indicating that sufficiency of probable cause affidavit could be questioned where it provided only "minimal information about the reliability of the dog," including his certification and experience, but not information regarding false positive alerts); Neuhoff v. State, 708 N.E.2d 889, 891 (Ind.Ct.App.1999) (finding sufficient a probable cause affidavit that included information about the dog's recertification, experience, and specialized training).
[5] What has and has not been addressed by the United States Supreme Court in this regard was summarized in a recent case comment on Caballes: "In its holding, the instant Court avoided the issue of context altogether. By contending that the canine sniff is a non-search, there is no need to even analyze whether the expectation of privacy in the vehicle's trunk was one that society was prepared to recognize as reasonable. Making such a cursory distinction, however, may well ignore the potential for abuse of this technique. The Court, therefore, perhaps should have proffered a footnote stating that the majority was expressing no opinion on whether a suspicionless canine sniff would be acceptable in the context of individuals walking down the street, or even at the homestead itself. This is possibly the most profound question yet to be answered by the decision in the instant case: Will the Court apply the analysis of Kyllo to a suspicionless canine sniff of the home in the future, or will it adopt the view of those circuits that have interpreted the setting in Place (a public place) to be irrelevant and have held that a canine sniff is not a search in any context?" Jeffrey A. Bekares, Case Comment, Constitutional Law: Ratifying Suspicionless Canine Sniffs: Dog Days on the Highways, 57 Fla. L. Rev. 963, 973-974 (Sept. 2005).
[6] The importance of the composition of the original panel in this case is demonstrated by the vote on whether or not to rehear the case en banc  six for and six against  leaving the ruling of the original panel intact.
[7] This is not a case where the defendant contended that the affidavit contained omissions made with intent to deceive or with reckless disregard of whether such information should have been revealed to the magistrate. See Pagan v. State, 830 So.2d 792, 807 (Fla.2002).
[8] The majority is concerned that the dog alert may have preceded the officers' detection of the odor of marijuana. This is not apparent from either the affidavit or the testimony at the hearing. Even assuming that the dog alert came first, and that it was a search, the officers' almost immediate detection of the same odor would fall under the inevitable discovery doctrine. In Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the Supreme Court adopted the "inevitable discovery" exception to the "fruit of the poisonous tree" doctrine. Under this exception, "evidence obtained as the result of unconstitutional police procedure may still be admissible provided the evidence would ultimately have been discovered by legal means." Maulden v. State, 617 So.2d 298, 301 (Fla.1993). The defendant here did not attack the veracity of the officers' olfactory observation. As was demonstrated above, the officers' presence on the doorstep was not a constitutional violation.
[9] The majority attempts to distinguish this case from Caballes by complaining that in the warrant affidavit there was neither a "statement" that Chevy was "well-trained," nor a "description" of the dog's "qualifications, experience, or reliability." This hyper-technical reading of the affidavit is improper, imposing a "technical requirement[] of elaborate specificity once exacted under common law pleadings," which, according to the Supreme Court, has "no proper place in this area." Ventresca, 380 U.S. at 108, 85 S.Ct. 741. The affidavit describes "Chevy" as a "drug detector dog." A dog does not obtain this label without training. At the hearing on the motion to suppress, Rabb questioned Detective Taranu about Chevy, revealing the following facts: (1) Chevy was certified; (2) the detective kept a usage log of the times Chevy was asked to make a detection; (3) the dog had been used in hundreds of investigations in the 12 months preceding the hearing; (4) the dog's "false alerts" were "very minimal;" (5) the dog alerted only to illegal drugs  cocaine, heroin, hashish, and methamphetamines. Rabb did not challenge the skill, training, or competence of the drug detecting dog in the trial court. See State v. Laveroni, 910 So.2d 333 (Fla. 4th DCA 2005) (describing procedure for challenging qualifications of a narcotics dog); Matheson v. State, 870 So.2d 8 (Fla. 2d DCA 2003); State v. Foster, 390 So.2d 469, 470 (Fla. 3d DCA 1980).