PERRY, J.
We have for review State v. Jardines, 9 So.3d 1 (Fla. 3d DCA 2008), in which the district court certified conflict with State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. We quash the decision in Jardines and approve the result in Rabb.
Police conducted a warrantless “sniff test” by a drug detection dog at Jardines’ home and discovered live marijuana plants inside. The trial court granted Jardines’ motion to suppress the evidence, and the State appealed. The district court reversed, and Jardines sought review in this Court. Jardines claims that the warrant-less “sniff test” violated his right against unreasonable searches under the Fourth Amendment. The issue presented here is *36 twofold: (i) whether a “sniff test” by a drug detection dog conducted at the front door of a private residence is a “search” under the Fourth Amendment and, if so, (ii) whether the evidentiary showing of wrongdoing that the government must make prior to conducting such a search is probable cause or reasonable suspicion.
The Fourth Amendment provides that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause.” U.S. Const, amend. IV. The United States Supreme Court has held that “ ‘[a]t the very core’ of the Fourth Amendment ‘stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.’ ” Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). Or, more succinctly, “[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no.” Kyllo, 533 U.S. at 31, 121 S.Ct. 2038.
First, the dog “sniff test” that was conducted in the present case was an intrusive procedure. As explained more fully below, the “sniff test” was a sophisticated undertaking that was the end result of a sustained and coordinated effort by various law enforcement agencies. On the scene, the procedure involved multiple police vehicles, multiple law enforcement personnel, including narcotics detectives and other officers, and an experienced dog handler and trained drug detection dog engaged in a vigorous search effort on the front porch of the residence. Tactical law enforcement personnel from various government agencies, both state and federal, were on the scene for surveillance and backup purposes. The entire on-the-scene government activity — i.e., the preparation for the “sniff test,” the test itself, and the aftermath, which culminated in the full-blown search of Jardines’ home — lasted for hours. The “sniff test” apparently took place in plain view of the general public. There was no anonymity for the resident.
Such a public spectacle unfolding in a residential neighborhood will invariably entail a degree of public opprobrium, humiliation and embarrassment for the resident, for such dramatic government activity in the eyes of many — neighbors, passers-by, and the public at large — will be viewed as an official accusation of crime. Further, if government agents can conduct a dog “sniff test” at a private residence without any prior eviden-tiary showing of wrongdoing, there is nothing to prevent the agents from applying the procedure in an arbitrary or discriminatory manner, or based on whim and fancy, at the home of any citizen. Such an open-ended policy invites overbearing and harassing conduct. Accordingly, we conclude that a “sniff test,” such as the test that was conducted in the present case, is a substantial government intrusion into the sanctity of the home and constitutes a “search” within the meaning of the Fourth Amendment. As such, it must be preceded by an evi-dentiary showing of wrongdoing.
And second, we note that the parties in the present case have failed to point to a single case in which the United States Supreme Court has indicated that a search for evidence for use in a criminal prosecution, absent special needs beyond the normal need of law enforcement, may be based on anything other than probable cause. We assume that this is because, as explained more fully below, all that Court’s precedent in this area indicates just the opposite. And that precedent, we recog *37 nize, applies with extra force where the sanctity of the home is concerned. Accordingly, we conclude that probable cause, not reasonable suspicion, is the proper evidentiary showing of wrongdoing that the government must make prior to conducting a dog “sniff test” at a private residence.
I. BACKGROUND
On November 3, 2006, Detective Pedraja of the Miami-Dade Police Department received an unverified “crime stoppers” tip that the home of Joelis Jardines was being used to grow marijuana. One month later, on December 6, 2006, Detective Pedraja and Detective Bartlet and his drug detection dog, Franky, approached the residence. The underlying facts, which are discussed more fully below, are summarized briefly in the separate opinion of a district court judge in Jardines:
The Miami-Dade County Police Department received a Crime Stoppers tip that marijuana was being grown at the home of defendant-appellee Joelis Jar-dines. One month later the detective went to the home at 7 a.m. He watched the home for fifteen minutes. There were no vehicles in the driveway, the blinds were closed, and there was no observable activity.
After fifteen minutes, the dog handler arrived with the drug detection dog. The handler placed the dog on a leash and accompanied the dog up to the front door of the home. The dog alerted to the scent of contraband.
The handler told the detective that the dog had a positive alert for the odor of narcotics. The detective went up to the front door for the first time, and smelled marijuana. The detective also observed that the air conditioning unit had been running constantly for fifteen minutes or so, without ever switching off. [N. 8. According to the detective, in a hydroponics lab for growing marijuana, high intensity light bulbs are used which create heat. This causes the air conditioning unit to run continuously without cycling off.]
The detective prepared an affidavit[1] and applied for a search warrant, which *38 was issued. A search was conducted, which confirmed that marijuana was being grown inside the home. The defendant was arrested.
The defendant moved to suppress the evidence seized at his home. The trial court conducted an evidentiary hearing at which the detective and the dog handler testified. The trial court suppressed the evidence on authority of State v. Rabb.
Jardines, 9 So.3d at 10-11 (Cope, J., concurring in part and dissenting in part) (footnote omitted).
The State appealed the suppression ruling, and the district court reversed based on the following reasoning:
In sum, we reverse the order suppressing the evidence at issue. We conclude that no illegal search occurred. The officer had the right to go up to defendant’s front door. Contrary to the holding in Rabb, a warrant was not necessary for the drug dog sniff, and the officer’s sniff at the exterior door of defendant’s home should not have been viewed as “fruit of the poisonous tree.” The trial judge should have concluded substantial evidence supported the magistrate’s determination that probable cause existed. Moreover, the evidence at issue should not have been suppressed because its discovery was inevitable. To the extent our analysis conflicts with Rabb, we certify direct conflict.
Jardines, 9 So.3d at 10 (footnote omitted). Jardines sought review in this Court based on certified conflict with State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006),[2] which we *39 granted.[3]
II. THE APPLICABLE LAW
The Fourth Amendment to the United States Constitution contains both the Search and Seizure Clause and the Warrant Clause and provides as follows in full:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const, amend. IV.[4] With respect to the meaning of the amendment, the courts have come to accept the formulation set forth by Justice Harlan in Katz[5]:
As the Court’s opinion states, “the Fourth Amendment protects people, not places.” The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a “place.” My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as “reasonable.” Thus a man’s home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the “plain view” of outsiders are not “protected” because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable.
Katz, 389 U.S. at 361, 88 S.Ct. 507 (emphasis added) (Harlan, J., concurring); see California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) *40 (“Katz posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?”). In sum, “wherever an individual may harbor a ‘reasonable expectation of privacy1 he is entitled to be free from unreasonable governmental intrusion.” Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (quoting Katz, 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring)).
A. Federal “Dog Sniff” Cases
The United States Supreme Court has addressed the issue of “sniff tests” by drug detection dogs in three cases. First, in United States v. Place, 462 U.S. 696, 103 5.Ct. 2637, 77 L.Ed.2d 110 (1983), that Court addressed the issue of whether police, based on reasonable suspicion, could temporarily seize a piece of luggage at an airport and then subject the luggage to a “sniff test” by a drug detection dog. After Place’s behavior at an airport aroused suspicion, police seized his luggage and subjected it to a “sniff test” by a drug detection dog at another airport and ultimately discovered cocaine inside. The federal district court denied Place’s motion to suppress, and the court of appeals reversed. The United States Supreme Court affirmed, concluding that the seizure, which lasted ninety minutes, was an impermissi-bly long Terry[6] stop, but the Court ruled as follows with respect to the dog “sniff test”:
The Fourth Amendment “protects people from unreasonable government intrusions into their legitimate expectations of privacy.” We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. A “canine sniff’ by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer’s rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.
In these respects, the canine sniff is sui generis. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here— exposure of respondent’s luggage, which was located in a public place, to a trained canine — did not constitute a “search” within the meaning of the Fourth Amendment.
Place, 462 U.S. at 706-07, 103 S.Ct. 2637 (quoting United States v. Chadwick, 433 U.S. 1, 7, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)).
*41 Second, in City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), the United States Supreme Court addressed the issue of whether police could stop a vehicle at a drug interdiction checkpoint and subject the exterior of the vehicle to a “sniff test” by a drug detection dog. Police stopped Edmond and other motorists at a dragnet-style drug interdiction checkpoint, and a drug detection dog was walked around the exterior of each vehicle. Later, Edmond filed a class action lawsuit against the city, claiming that the checkpoints violated his Fourth Amendment rights, and he sought a preliminary injunction barring the practice. The federal district court denied the injunction, and the court of appeals reversed. The United States Supreme Court affirmed, explaining that “[w]e have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing.” Edmond, 531 U.S. at 41, 121 S.Ct. 447. With respect to the dog “sniff test,” the Court stated as follows:
It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment. The fact that officers walk a narcotics-detection dog around the exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search. See United States v. Place, 462 U.S. 696 [103 S.Ct. 2637, 77 L.Ed.2d 110] (1983). Just as in Place, an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics. See ibid. Like the dog sniff in Place, a sniff by a dog that simply walks around a car is “much less intrusive than a typical search.” Ibid.
Edmond, 531 U.S. at 40, 121 S.Ct. 447 (citation omitted) (quoting Place, 462 U.S. at 707, 103 S.Ct. 2637).
And third, in Illinois v. Caballes, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), the United States Supreme Court addressed the issue of whether police, during the course of a lawful traffic stop, could subject the exterior of a vehicle to a “sniff test” by a drug detection dog. After Caballes was stopped for speeding and while the officer was writing the citation, a second officer arrived at the scene and subjected the exterior of the vehicle to a dog “sniff test.” The dog alerted at the trunk and the officers searched the trunk and found marijuana. The state trial court denied Caballes’ motion to suppress, and the Illinois Supreme Court reversed. The United States Supreme Court reversed, ruling as follows:
Official conduct that does not “compromise any legitimate interest in privacy” is not a search subject to the Fourth Amendment. Jacobsen, 466 U.S., at 123 [104 S.Ct. 1652]. We have held that any interest in possessing contraband cannot be deemed “legitimate,” and thus, governmental conduct that only reveals the possession of contraband “compromises no legitimate privacy interest.” Ibid. This is because the expectation “that certain facts will not come to the attention of the authorities” is not the same as an interest in “privacy that society is prepared to consider reasonable.” Id., at 122 [104 S.Ct. 1652] (punctuation omitted). In United States v. Place, 462 U.S. 696 [103 S.Ct. 2637, 77 L.Ed.2d 110] (1983), we treated a canine sniff by a well-trained narcotics-detection dog as “sui generis ” because it “discloses only the presence or absence of narcotics, a contraband item.” Id., at 707 [103 S.Ct. 2637]; see also Indianapolis v. Edmond, 531 U.S. 32, 40 [121 S.Ct. 447, 148 L.Ed.2d 333] (2000). Respondent like *42 wise concedes that “drug sniffs are designed, and if properly conducted are generally likely, to reveal only the presence of contraband.” Although respondent argues that the error rates, particularly the existence of false positives, call into question the premise that drug-detection dogs alert only to contraband, the record contains no evidence or findings that support his argument. Moreover, respondent does not suggest that an erroneous alert, in and of itself, reveals any legitimate private information, and, in this case, the trial judge found that the dog sniff was sufficiently reliable to establish probable cause to conduct a full-blown search of the trunk.
Accordingly, the use of a well-trained narcotics-detection dog-one that “does not expose noncontraband items that otherwise would remain hidden from public view,” Place, 462 U.S., at 707 [103 S.Ct. 2637]-during a lawful traffic stop generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of respondent’s car while he was lawfully seized for a traffic violation. Any intrusion on respondent’s privacy expectations does not rise to the level of a constitutionally cognizable infringement.
Caballes, 543 U.S. at 408-09, 125 S.Ct. 834 (citation omitted).
Further, the Court in Caballes distinguished its ruling in Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), as follows:
This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search. Kyllo v. United States, 533 U.S. 27 [121 S.Ct. 2038, 150 L.Ed.2d 94] (2001). Critical to that decision was the fact that the device was capable of detecting lawful activity — in that case, intimate details in a home, such as “at what hour each night the lady of the house takes her daily sauna and bath.” Id., at 38 [121 S.Ct. 2038], The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent’s hopes or expectations concerning the nondetection of contraband in the trunk of his ear. A dog sniff conducted during a eoncededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.
Caballes, 543 U.S. at 409-10, 125 S.Ct. 834.
B. Two Additional Federal Cases
In two additional cases, the United States Supreme Court has addressed Fourth Amendment issues that are relevant here. First, in United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Court addressed the issue of whether police, without a showing of probable cause, could temporarily seize and inspect a small portion of the contents of a package, which had been damaged in transit and was being held by a private shipping company, and then subject the contents to a field test for cocaine. After employees of a private freight carrier discovered a suspicious white powder in a damaged package and notified federal agents, the agents conducted a field chemical test on the powder and determined that it was cocaine. The federal district court denied Jacobsen’s motion to suppress, and the court of appeals reversed. The United States Supreme Court reversed, reasoning as follows:
A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclu *43 sion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative — merely disclosing that the substance is something other than cocaine — such a result reveals nothing of special interest. Congress has decided — and there is no question about its power to do so — to treat the interest in “privately” possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably “private” fact, compromises no legitimate privacy interest.
This conclusion is dictated by United States v. Place, 462 U.S. 696 [103 S.Ct. 2637, 77 L.Ed.2d 110] (1983), in which the Court held that subjecting luggage to a “sniff test” by a trained narcotics detection dog was not a “search” within the meaning of the Fourth Amendment. ...
Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.
Jacobsen, 466 U.S. at 123-24 [104 S.Ct. 1652] (footnote omitted).
And second, in Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), the United States Supreme Court addressed the issue of whether police, without a warrant, could use a thermal-imaging device to scan a private home to determine if the amount of heat generated by the home was consistent with the use of high-intensity lamps used in growing marijuana. After federal agents became suspicious that Kyllo was growing marijuana in his home, agents scanned the outside of the triplex with a thermal-imaging device, which showed that the garage roof and side of the residence were inordinately warm. The agents obtained a warrant and searched the residence and found live marijuana plants inside. The federal district court denied Kyllo’s motion to suppress, and the circuit court affirmed. The United States Supreme Court reversed, reasoning as follows:
The Katz test — whether the individual has an expectation of privacy that society is prepared to recognize as reasonable — has often been criticized as circular, and hence subjective and unpredictable. While it may be difficult to refine Katz when the search of areas such as telephone booths, automobiles, or even the curtilage and uncovered portions of residences is at issue, in the case of the search of the interior of homes — the prototypical and hence most commonly litigated area of protected privacy — there is a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that exists, and that is acknowledged to be reasonable. To withdraw protection of this minimum expectation would be to permit police technology to erode the privacy guaranteed by the Fourth Amendment. We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical “intrusion into a constitutionally protected area” constitutes a search — at least where (as here) the technology in question is not in general public use. This assures preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted. On the basis of this criterion, *44 the information obtained by the thermal imager in this case was the product of a search.
[[Image here]]
We have said that the Fourth Amendment draws “a firm line at the entrance to the house.” That line, we think, must be not only firm but also bright — which requires clear specification of those methods of surveillance that require a warrant. While it is certainly possible to conclude from the videotape of the thermal imaging that occurred in this case that no “significant” compromise of the homeowner’s privacy has occurred, we must take the long view, from the original meaning of the Fourth Amendment forward.
“The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens.” Carroll v. United States, 267 U.S. 182, 149 [45 S.Ct. 280, 69 L.Ed. 543] (1925).
Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a “search” and is presumptively unreasonable without a warrant.
Kyllo, 538 U.S. at 34-40, 121 S.Ct. 2038 (citations omitted) (quoting Silverman, 365 U.S. at 512, 81 S.Ct. 679; Payton v. New York, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).
III. ANALYSIS
As noted above, the issue raised in the present case is twofold: (i) whether a “sniff test” by a drug detection dog conducted at the front door of a private residence is a “search” under the Fourth Amendment and, if so, (ii) whether the evidentiary showing of wrongdoing that the government must make prior to conducting such a search is probable cause or reasonable suspicion.
A. The Federal “Dog Sniff” Cases Are Inapplicable to the Home
For reasons explained below, we conclude that the analysis used in the above federal “dog sniff’ cases is inapplicable to a “sniff test” conducted at a private home. First, we recognize that the United States Supreme Court has ruled that because a “sniff test” conducted by a drug detection dog is “sui generis,” or unique, in the sense that it is minimally intrusive and is designed to detect only illicit drugs and nothing more, Place, 462 U.S. at 707, 103 S.Ct. 2637, a dog “sniff test” does not implicate Fourth Amendment rights when employed in the following settings: (i) when conducted on luggage that has been seized at an airport based on reasonable suspicion of unlawful activity, where the luggage has been separated from its owner and the “sniff test” is conducted in a public place, see Place, 462 U.S. 696, 103 S.Ct. 2637; (ii) when conducted on the exterior of a vehicle that has been stopped in a dragnet-style stop at a drug interdiction checkpoint, see Edmond, 531 U.S. 32, 121 S.Ct. 447; and (iii) when conducted on the exterior of a vehicle that has been subjected to a lawful traffic stop. See Caballes, 543 U.S. 405, 125 S.Ct. 834. Further, the United States Supreme Court has applied a similar analysis to a chemical “field test” for drugs when conducted on the contents of a package that has been damaged in transit and is being held by a private shipping company. See Jacobsen, 466 U.S. 109, 104 S.Ct. 1652.
We note, however, that in each of the above cases, the United States Supreme Court was careful to tie its ruling to the particular facts of the case. See Place, 462 *45 U.S. at 707, 103 S.Ct. 2637 (“[W]e conclude that the particular course of investigation that the agents intended to pursue here— exposure of respondent’s luggage, which was located in a public place, to a trained canine — did not constitute a ‘search’ within the meaning of the Fourth Amendment.”); Edmond, 531 U.S. at 40, 121 S.Ct. 447 (“The fact that officers walk a narcotics-detection dog around the exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search.”); Caballes, 543 U.S. at 409, 125 S.Ct. 834 (“In this case, the dog sniff was performed on the exterior of respondent’s car while he was lawfully seized for a traffic violation. Any intrusion on respondent’s privacy expectations does not rise to the level of a constitutionally cognizable infringement.”); Jacobsen, 466 U.S. at 123, 104 S.Ct. 1652 (“It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised.”). Nothing in the above cases indicates that the same analysis would apply to a dog “sniff test” conducted at a private residence.
Significantly, all the sniff and field tests in the above cases were conducted in a minimally intrusive manner upon objects— luggage at an airport in Place, vehicles on the roadside in Edmond and Caballes, and a package in transit in Jacobsen — that warrant no special protection under the Fourth Amendment. All the tests were conducted in an impersonal manner that subjected the defendants to no untoward level of public opprobrium, humiliation or embarrassment. There was no public link between the defendants and the luggage as it was being tested in Place or the package as it was being tested in Jacobsen, and the defendants retained a degree of anonymity during the roadside testing of their vehicles in Edmond and Caballes. Further, and more important, under the particular circumstances of each of the above cases, the tests were not susceptible to being employed in a discriminatory or arbitrary manner — the luggage in Place had been seized based on reasonable suspicion; the vehicle in Edmond had been seized in a dragnet-style stop; the vehicle in Caballes had been seized pursuant to a lawful traffic stop; and the contents of the package in Jacobsen had been seized after the package had been damaged in transit by a private carrier. All these objects were seized and tested in an objective and nondiscriminatory manner, and there was no evidence of overbearing or harassing government conduct. There was no need for Fourth Amendment protection. As explained below, however, such is not the case with respect to a dog “sniff test” conducted at a private residence.
B. “Sniff Test” at a Private Home
As noted above, the United States Supreme Court has held that “wherever an individual may harbor a reasonable ‘expectation of privacy,’ he is entitled to be free from unreasonable government intrusion.” Terry, 392 U.S. at 9, 88 S.Ct. 1868 (quoting Katz, 389 U.S. at 351, 88 S.Ct. 507 (Harlan, J., concurring)). Nowhere is this right more resolute than in the private home: “ ‘At the very core’ of the Fourth Amendment ‘stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.’ ” Kyllo, 533 U.S. at 31, 121 S.Ct. 2038 (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). The sanctity of the citizen’s home is a basic tenet of Anglo-American jurisprudence:
In 1604, an English court made the now-famous observation that “the house of every one is to him as his . castle and fortress, as well for his defence against *46 injury and violence, as for his repose.” Semayne’s Case, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (K.B.). In his Commentaries on the Laws of England, William Blackstone noted that
“the law of England has so particular and tender a regard to the immunity of a man’s house, that it stiles it his castle, and will never suffer it to be violated with impunity: agreeing herein with the sentiments of ancient Rome.... For this reason no doors can in general be broken open to execute any civil process; though, in criminal causes, the public safety supersedes the private.” 4 Commentaries 228 (1765-1769).
The Fourth Amendment embodies this centuries-old principle of respect for the privacy of the home....
Wilson v. Layne, 526 U.S. 608, 609-10, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); see also United States v. United States Dist. Court for Eastern Dist. of Mich., 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (“[PJhysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.... ”).
Although police generally may initiate a “knock and talk” encounter at the front door of a private residence without any prior showing of wrongdoing, see State v. Morsman, 394 So.2d 408, 409 (Fla.1981) (“Under Florida law it is clear that one does not harbor an expectation of privacy on a front porch where salesmen or visitors may appear at any time.”), a dog “sniff test” is a qualitatively different matter. Contrary to popular belief, a “sniff test” conducted at a private residence is not necessarily a casual affair in which a canine officer and dog approach the front door and the dog then performs a subtle “sniff test” and signals an “alert” if drugs are detected. Quite the contrary. In the present case, for instance, on the morning of December 5, 2006, members of the Miami-Dade Police Department, Narcotics Bureau, and agents of the Drug Enforcement Administration (DEA), United States Department of Justice, conducted a surveillance of Jardines’ home. As Detectives Pedraja and Bartlet and the drug detection dog, Franky, approached the residence, Sergeant Ramirez and Detective Donnelly of the Miami-Dade Police Department established perimeter positions around the residence and federal DEA agents assumed stand-by positions as backup units.
The “sniff test” conducted by the dog handler and his dog was a vigorous and intensive procedure. Detective Bartlet testified as follows on direct examination at the suppression hearing:
Q. After you stepped onto the property, what did you do?
A. I, basically, approached with my canine partner. The way my canine partner works, he is very strongly driven, so he is actually out in front of me. He is one of the dogs that will actually pull me around very dramatically.
So he pulled directly up the porch as he is trained to do, and immediately upon crossing the threshold of the archway which you see here, upon entering the alcove of the porch, he began tracking an airborne odor.
Q. Let me stop you there, Officer.
A. Sure.
Q. At this time in time, how far into this home did you get or into the en-tranceway of the home did you get? I want you to point to the Court.
A. You see there’s a walker there? That’s about the area that it was I was in.
Q. There is also an archway there. Did you ever cross in through that archway?
*47 A. Not that I recall, no.
Q. So, where exactly was your dog when he alerted to an alert of contraband?
A. The alert for the dog, basically, is the minute I observed out of normal behavior for him.
In this particular case, the abnormal behavior would have been the head high, tracking the airborne odor. He began tracking that airborne odor by bracketing and tracking back and forth.
Q. What exactly is bracketing?
A. Bracketing is a technique that the dog uses once he comes to an odor— which is basically you can think of it as a cloud of odor.
Once he gets into that cloud of odor, he is trained to go to the strongest point. We call that source.
So, he is bracketing back and forth, back and forth, within the cone of odor to determine the strongest source. In this particular residence source for him was the base of the door.
Q. And is Detective Pedraja observing this as well? You can’t speak for him?
A. Yeah, I — to be honest with you, all I’m doing is concentrating on the dog, watching the dog’s head movements, his body postures, whence he is indicating towards me.
Q. Detective, your dog is on a leash at that point?
A. Oh, absolutely.
Q. How long is that leash?
A. It’s approximately six feet. And then you have the length of my arm, so you can assume from there.
Q. Okay. Once the dog began — what is it the dog did that told you he had an alert?
A. Okay. He immediately told me he had an alert when he began tracking that odor. Now I know he is in odor and he needs to find source.
So, what I do is I get back as far as I can. I let him have the full six feet of the leash plus whatever safe distance I can give him without running off in order for him to determine where source is.
For example, if I don’t do that, source could be the motorcycle, it could be somewhere else other than the front door.
So, in order for me to fully observe his alert and where the source is, I need to be creating as much distance as I can.
Often handlers will drop the leash and walk away completely. I don’t do that with him because he is a little bit wild, so I maintain control of the leash and observe him from a distance so that I can indicate where source is going to be.
Q. Okay. So, once he detects a source and he is bracketing and he is doing this behavior, what is the next thing that you observe this dog do?
A. The final culmination of his abnormal behavior is a sitting position, and he did that immediately following the sniff at the base of the door, which indicates source to me.
Q. And once Franky, your dog, did that, what did you then do?
A. I then pulled him off of the sit and returned to my vehicle.
Q. Did you at any point in time communicate what the dog did to anybody?
A. Yeah, I indicated to the lead detective that there was a positive alert for the odor of narcotics.
Q. And where exactly, in what direction around you, was the detective at that point?
A. He would have been behind me, so I passed him up in the driveway.
*48 Q. Once you pulled the dog away from the door, where did you then go?
A. To my vehicle.
With respect to the location of Detective Pedraja in relation to Detective Bartlet and Franky during the “sniff test,” Bartlet testified as follows on redirect examination at the suppression hearing:
Q. Would Detective Pedraja be in front of you as you are conducting canine — I don’t even know what you would call it.
[[Image here]]
[A.] Would he be in front of — while Franky is sniffing the door? Definitely not.
Q. Why not?
A. Because he would be obstructing his ability to perform. He would be blocking him. He would be — if he was standing in front of the door, Franky may not be able to get to source. So he needs to be out of the way.
Q. Was Detective Pedraja standing next to you?
A. No.
Q. Why not?
A. Because he probably would get knocked over by Franky when Franky is spinning around trying to find source.
[THE PROSECUTOR]: No further questions.
After the “sniff test” was completed, Detective Bartlet and Franky left the scene to assist in another case. Detective Pedraja, after waiting at the residence for fifteen or twenty minutes, also left the scene to prepare a search warrant and to submit it to a magistrate. Federal DEA agents, however, remained behind to maintain surveillance of Jardines’ home. Pe-draja obtained a search warrant later that day and returned to the scene. About an hour later, members of the Miami-Dade Police Department, Narcotics Bureau, and DEA agents executed the warrant by gaining entry to Jardines’ home through the front door. As agents entered the front door, Jardines exited through a sliding glass door at the rear of the house. He was apprehended by Special Agent Wilson of the DEA and was turned over to the Miami-Dade Police Department. He was charged with trafficking in marijuana and theft of electricity.
Based on the foregoing, we conclude that the dog “sniff test” that was conducted here was an intrusive procedure. The “sniff test” was a sophisticated undertaking that was the end result of a sustained and coordinated effort by various law enforcement departments. On the scene, the procedure involved multiple police vehicles, multiple law enforcement personnel, including narcotics detectives and other officers, and an experienced dog handler and trained drug detection dog engaged in a vigorous search effort on the front porch of the residence. Tactical law enforcement personnel from various government agencies, both state and federal, were on the scene for surveillance and backup purposes. The entire on-the-scene government activity — i.e., the preparation for the “sniff test,” the test itself, and the aftermath, which culminated in the full-blown search of Jardines’ home — lasted for hours. The “sniff test” apparently took place in plain view of the general public. There was no anonymity for the resident.
Such a public spectacle unfolding in a residential neighborhood will invariably entail a degree of public opprobrium, humiliation and embarrassment for the resident, whether or not he or she is present at the time of the search, for such dramatic government activity in the eyes of many-neighbors, passers-by, and the public at large-will be viewed as an official accusation of crime. Cf. Place, 462 U.S. at 707, 103 S.Ct. 2687 (explaining that the dog *49 “sniff test” in that case was not a “search” within the meaning of the Fourth Amendment because it was limited in scope and was anonymous and did not subject the individual to “embarrassment and inconvenience”). And if the resident happens to be present at the time of the “sniff test,” such an intrusion into the sanctity of his or her home will generally be a frightening and harrowing experience that could prompt a reflexive or unpredictable response.
Further, all the underlying circumstances that were present in the above federal “dog sniff’ and “field test” cases that guaranteed objective, uniform application of those tests — i.e., the temporary seizure of luggage based on reasonable suspicion of criminal activity in Place; the temporary seizure of a vehicle in a dragnet-style stop at a drug interdiction checkpoint in Edmond; the temporary seizure of a vehicle based on a lawful traffic stop in Caballes; and the temporary seizure of a portion of the contents of a package that had been damaged in transit in Jacobsen — are absent from a warrantless “sniff test” conducted at a private residence. Unlike the objects in those cases, a private residence is not susceptible to being seized beforehand based on objective criteria. Thus, if government agents can conduct a dog “sniff test” at a private residence without any prior evidentiary showing of wrongdoing, there is simply nothing to prevent the agents from applying the procedure in an arbitrary or discriminatory manner, or based on whim and fancy, at the home of any citizen. Cf. Camara v. Mun. Court of City & Cnty. of S. F., 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (“The basic purpose of [the Fourth] Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.”). Such an open-ended policy invites overbearing and harassing conduct.[7]
In sum, a “sniff test” by a drug detection dog conducted at a private residence does not only reveal the presence of contraband, as was the case in the federal “sui generis” dog sniff cases discussed above, but it also constitutes an intrusive procedure that may expose the resident to public opprobrium, humiliation and embarrassment, and it raises the specter of arbitrary and discriminatory application. Given the special status accorded a citizen’s home under the Fourth Amendment, we conclude that a “sniff test,” such as the test that was conducted in the present case, is a substantial government intrusion into the sanctity of the home and constitutes a “search” within the meaning of the Fourth Amendment. As such, it warrants the safeguards that inhere in that amendment — specifically, the search must be preceded by an evidentiary showing of wrongdoing. We note that the rulings of other state[8] and federal[9] courts with re- *50 spect to a dog “sniff test” conducted at a private residence are generally mixed, as are the rulings of other state[10] and federal [11] courts with respect a dog “sniff test” conducted at an apartment or other temporary dwelling.
C. The Requirement of Probable Cause
As noted above, the Warrant Clause of the Fourth Amendment provides that “no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.” U.S. Const, amend. IV. The United States Supreme Court has noted the key protective role that this clause plays with respect to private property:
Though there has been general agreement as to the fundamental purpose of the Fourth Amendment, translation of the abstract prohibition against “unreasonable searches and seizures” into workable guidelines for the decision of particular cases is a difficult task which has for many years divided the members of this Court. Nevertheless, one governing principle, justified by history and by current experience, has consistently been followed; except in certain carefully defined classes of cases, a search of private property without proper consent is “unreasonable” unless it has been authorized by a valid search warrant.
Camara, 387 U.S. at 528-29, 87 S.Ct. 1727. Specifically, with respect to the home, that Court has noted as follows:
*51 The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.
Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948); see also Welsh v. Wisconsin, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (“[A] principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest.”). Or, more succinctly: “With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no.” Kyllo, 533 U.S. at 31, 121 S.Ct. 2038; see also Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (“It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.”) (internal quotation marks omitted).
The Court of Appeals for the District of Columbia in United States v. Colyer, 878 F.2d 469 (D.C.Cir.1989), was confronted with the following question: if a dog “sniff test” is a “search” under the Fourth Amendment and must be preceded by an evidentiary showing of wrongdoing, must that showing be probable cause, or reasonable suspicion? That court addressed the question at length:
In his concurring opinion in Place, Justice Blackmun suggested that “a dog sniff may be a search, but a minimally intrusive one that could be justified in this situation under Terry upon a mere reasonable suspicion.” 462 U.S. at 723 [103 S.Ct. 2637] (Blackmun, J., concurring in judgment). We find ourselves hard pressed for authority from the Supreme Court to support Justice Black-mun’s underlying premise — that there is a category of “minimally intrusive” searches that are supportable under Terry on less than probable cause.
It is certainly true that the Supreme Court has upheld a wide variety of searches on less than probable cause as traditionally understood, but in no case was a law-enforcement search denominated “minimally intrusive.” Indeed, the Supreme Court’s opinion in Arizona v. Hicks, [480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) ] may indicate that the contrary is the case, ie., that the Fourth Amendment knows no search but a “full-blown search.” Hicks, 480 U.S. at 328 [107 S.Ct. 1149] (“A search is a search, even if it happens to disclose nothing but the bottom of a turntable.”). Compare id. with id. at 333 [107 S.Ct. 1149] (O’Connor, J., dissenting) (“dis-tin[guishing] between searches based on their relative intrusiveness ... is entirely consistent with our Fourth Amendment jurisprudence”).
Rather than interpreting Terry as broad authority for the proposition that minimally intrusive searches may be justified on the basis of reasonable suspicion, the Supreme Court has on several occasions limited Terry to its precise underpinnings, i.e., protective searches for weapons. See Dunaway v. New York, 442 U.S. 200, 210 [99 S.Ct. 2248, 60 L.Ed.2d 824] (1979) (Terry is directed to “limited, on-the-street frisk[s] for weapons.”). Indeed, the Court has gone so far as to say that Terry provides no support for “any search whatever for anything but weapons.” Ybarra v. Illinois, 444 U.S. 85, 93-94 [100 S.Ct. 338, 62 L.Ed.2d 238] (1979). See also Penn *52 sylvania v. Mimms, 434 U.S. 106, 110 [98 S.Ct. 330, 54 L.Ed.2d 331] (1977) (per curiam); Sibron v. New York, 392 U.S. 40, 64-65 [88 S.Ct. 1889, 20 L.Ed.2d 917] (1968) (“The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception-the protection of the officer by disarming a potentially dangerous man.”). Thus, Professor LaFave seems correct in concluding that “there is no search-for-evidence counterpart to the Terry weapons search, permissible on only a reasonable suspicion that such evidence would be found.” [3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 9.4(g), at 539 (2d ed. 1987) ].
However, Terry does represent one of a lengthy line of cases in which the Supreme Court has upheld a search or seizure “[w]here a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause.” New Jersey v. T.L.O., 469 U.S. 325, 341 [105 S.Ct. 733, 83 L.Ed.2d 720] (1985). Yet a careful reading of the Supreme Court’s teachings leaves us doubtful that “reasonableness balancing” is appropriate in the context of the present case. Five times in as many years the Court has indicated that balancing is only appropriate when warranted by “special needs, beyond the normal need for law enforcement.” See Skinner v. Railway Labor Executives’ Assoc., 489 U.S. 602 [109 S.Ct. 1402, 103 L.Ed.2d 639] (1989); National Treasury Employees Union v. Von Raab, 489 U.S. 656 [109 S.Ct. 1384, 103 L.Ed.2d 685] (1989); Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); O’Connor v. Ortega, [480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) ]; New Jersey v. T.L.O., 469 U.S. at 351 [105 S.Ct. 733] (Blackmun, J., concurring in judgment).
This interpretation explains the various cases in which the Supreme Court has held searches to be lawful despite the absence of probable cause as traditionally understood. See T.L.O., 469 U.S. 325 [105 S.Ct. 733] (search by school official of student’s purse); O’Connor, 480 U.S. 709 [107 S.Ct. 1492] (work-related search by governmental employer); Griffin, 483 U.S. [at] 873-74 [107 S.Ct. 3164] (search of probationer’s home); Camara v. Municipal Court, 387 U.S. 523 [87 S.Ct. 1727, 18 L.Ed.2d 930] (1967) (housing inspections); New York v. Burger, [482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) ] (inspections of highly regulated business premises); Donovan v. Dewey, 452 U.S. 594 [101 S.Ct. 2534, 69 L.Ed.2d 262] (1981) (inspections of underground mines); Bell v. Wolfish, 441 U.S. 520, 558-60 [99 S.Ct. 1861, 60 L.Ed.2d 447] (1979) (body cavity searches of prison inmates); United States v. Brignoni-Ponce, 422 U.S. 873, 880-81 [95 S.Ct. 2574, 45 L.Ed.2d 607] (1975) (border patrols); United States v. Biswell, 406 U.S. 311, 316 [92 S.Ct. 1593, 32 L.Ed.2d 87] (1972) (inspections of “pervasively regulated business” for compliance with Gun Control Act); Terry, 392 U.S. 1 [88 S.Ct. 1868] (search for weapons, to protect officer and public). In no case has the Supreme Court indicated that a search for evidence qua evidence might qualify as a “special need” that would warrant reasonableness balancing. Common sense suggests that it is not.
To be sure, the Supreme Court has upheld on reasonable suspicion a variety of “minimally intrusive” seizures in contexts different from the “stop and frisk” originally approved in Terry. In such *53 cases, the “ ‘seizures’ [were] so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment ‘seizures’ reasonable could be replaced by a balancing test.” Dunaway v. New York, 442 U.S. at 210 [99 S.Ct. 2248]. See, e.g., United States v. Sharpe, 470 U.S. 675, 685 [105 S.Ct. 1568, 84 L.Ed.2d 605] (1985) (investigative stop of vehicle); Delaware v. Prouse, 440 U.S. 648 [99 S.Ct. 1391, 59 L.Ed.2d 660] (1979) (random checks for drivers’ licenses and vehicle registration); United States v. Brignoni-Ponce, 422 U.S. at 880-81 [95 S.Ct. 2574] (brief investigative stop of motorists near border for questioning; analogizing situation to encounter addressed in Terry)-, see also United States v. Villamonte-Marquez, 462 U.S. 579, 592 [103 S.Ct. 2573, 77 L.Ed.2d 22] (1983) (random seizure of vessel in order to examine manifest); United States v. Martinez-Fuerte, 428 U.S. [543, 560, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) ] (brief random checkpoint questioning for aliens). Although there may be no compelling reason to differentiate between seizures on the basis of their intrusiveness and failing to likewise differentiate between types of searches, the fact remains that we are unable to point to a single Supreme Court case that has upheld a search on reasonable suspicion merely because it was minimally intrusive. See, e.g., Michigan v. Long, 463 U.S. 1032 [103 S.Ct. 3469, 77 L.Ed.2d 1201] (1983); Pennsylvania v. Mimms, 434 U.S. 106 [98 S.Ct. 330, 54 L.Ed.2d 331] (1977) (per curiam); Adams v. Williams, 407 U.S. 143 [92 S.Ct. 1921, 32 L.Ed.2d 612] (1972); cf. Martinez-Fuerte, 428 U.S. at 561 [96 S.Ct. 3074] (upholding as reasonable a random seizure and noting that it was not dealing with a search).
Colyer, 878 F.2d at 477-79 (citations omitted).
Professor LaFave has reached the same conclusion with respect to the issue of probable cause versus reasonable suspicion:
Assuming now that some uses of these dogs constitutes a search, it does not inevitably follow that they should be encumbered by the restrictions ordinarily applicable to other types of searches which are clearly more intrusive in character. While it has sometimes been asserted that if the use of trained dogs is a search then such surveillance is unconstitutional if conducted in absence of a warrant supported by probable cause, it may be argued that the Fourth Amendment does not demand such a result. In Terry v. Ohio, the Court upheld a limited warrantless search made upon less than full probable cause “by balancing the need to search ... against the invasion which the search ... entails,” and thus a similar approach might be taken as to the kind of search here under discussion. Although there are sound reasons for not employing too generously a graduated model of the fourth amendment, the notion that searches by use of dogs trained to detect narcotics ... is a lesser intrusion subject to lesser Fourth Amendment restrictions is an appealing one. This is because this particular investigative technique is a distinct police practice which quite obviously is much less intrusive than other searches. It seems rather unlikely, however, that the Supreme Court would now reach such a conclusion. The Court has declared that the Fourth Amendment knows no search but a “full-blown search,” asserted that Terry provides no support for “any search whatever for anything but weapons,” and cautioned that the balancing process is appropriate only when warranted by “special needs *54 beyond the normal need of law enforcement.”
1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.2(g), at 540-41 (4th ed. 2004) (quotation marks and footnotes omitted).
We agree with the above analyses and note that the parties in the present ease have failed to point to a single case in which the United States Supreme Court has indicated that a search for evidence for use in a criminal prosecution, absent special needs beyond the normal need of law enforcement, may be based on anything other than probable cause. We assume that this is because, as noted in the commentary above, all that Court’s precedent in this area indicates just the opposite. And that precedent, we recognize, applies with extra force where the sanctity of the home is concerned. Accordingly, we conclude that probable cause, not reasonable suspicion, is the proper evidentiary showing of wrongdoing that the government must make under the Fourth Amendment prior to conducting a dog “sniff test” at a private residence.
IV. THE SUPPRESSION RULING
A magistrate’s determination that probable cause exists for issuance of a search warrant is entitled to great deference when a trial court is considering a motion to suppress. Illinois v. Gates, 462 U.S. 213, 238-39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (“[T]he duty of a reviewing court is simply to ensure that the magistrate had a ‘substantial basis for ... concluding] that’ probable cause existed.”). And a trial court’s ruling on a motion to suppress in such a case is subject to the following standard of review: the reviewing court must defer to the trial court’s factual findings if supported by competent, substantial evidence but must review the trial court’s ultimate ruling independently, or de novo. State v. Glatzmayer, 789 So.2d 297, 301 n. 7 (Fla.2001); see also Connor v. State, 803 So.2d 598 (Fla.2001).
In the present case, the trial court granted Jardines’ motion to suppress, ruling as follows:
This cause having come before this Court on Defendant, Joelis Alex Jar-dines’, motion to suppress evidence seized from his house and this Court having reviewed the motion, the arguments of counsel, the court file and the records in this case, and being otherwise fully advised in the premises therein:
A drug detector dog was used to support probable cause for the issuance of a search warrant of the Defendant’s house. The Defendant moved to suppress the evidence of drugs recovered from his house as a result of the search warrant. Pursuant to State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006), this Court concludes that law enforcement’s use of a drug detector dog at the Defendant’s house door constituted an unreasonable and illegal search.
However, the Court must also consider, absent the dog sniff information, whether any independent and lawfully obtained evidence establishes a substantial basis for concluding that probable cause existed to support the issuance of a search warrant for the Defendant’s house.
The probable cause affidavit listed the information provided from a crime stoppers tip that marijuana was being grown at the residence as a basis to support probable cause for the issuance of a search warrant. However, the crime stoppers tip was unverified and came from an unknown individual rather than a qualified confidential informant. Additionally, there was no evidence to sug *55 gest the crime stoppers tip was corroborated by any evidence resulting from surveillance of the house. The only other evidence contained in the affidavit was that the window blinds were closed and the air conditioner unit was constantly running without recycling. This information, considered in its totality, simply does not suggest a fair probability of any broader criminal activity, such as the growing of marijuana in the Defendant’s house. Therefore, this Court concludes that no independent and lawfully obtained evidence establishes the probable cause necessary to support the issuance of a search warrant for the Defendant’s house.
Ordered and adjudged that even with great deference afforded to the search warrant for the Defendant’s house in this case, the probable cause affidavit did not provide a substantial basis for concluding that probable cause existed. Therefore, the motion to suppress evidence seized from the Defendant’s house is granted.
With respect to the fact that Detective Pedraja testified that he smelled the odor of live marijuana plants as he stood outside the front door of Jardines’ house, the trial court stated as follows in a footnote: “There was evidence that after the drug detection dog had alerted to the odor of a controlled substance, the officer also detected a smell of marijuana plants emanating from the front door. However, this information was only confirming what the detection dog had already revealed.”
As explained above, a warrantless “sniff test” by a drug detection dog conducted at the front door of a private residence is impermissible under the Fourth Amendment. Thus, the trial court properly excluded the results of the “sniff test” from its review of the magistrate’s probable cause determination. The remaining evidence consisted of the following: the unverified “crime stoppers” tip, the closed window blinds, and the constantly running air conditioner. As for Detective Pedra-ja’s statement that he detected the odor of live marijuana plants as he stood outside the front door, we note that the trial court had the opportunity to observe Detective Pedraja’s testimony first-hand at the suppression hearing. Further, the district court in Rabb addressed an identical situation and concluded as follows:
[Bjecause the chronology of the probable cause affidavit suggests that the dog alert to marijuana occurred prior to law enforcement’s detection of its odor, we cannot assume that law enforcement detected the odor of marijuana before the dog alerted.... As such, this is not a case in which a law enforcement officer used his senses to detect something within his plain smell; rather, a law enforcement officer used enhanced, animal senses to detect something inside a home that he might not otherwise have detected.
Rabb, 920 So.2d at 1191. Based on our review of the present record, we conclude that the trial court’s factual findings are supported by competent, substantial evidence and the trial court’s ultimate ruling is supported in the law. The district court erred in reversing the suppression ruling.
V. CONCLUSION
“We have said that the Fourth Amendment draws, ‘a firm line at the entrance to the house.’ That line, we think, must be not only firm but also bright — which requires clear specification of those methods of surveillance that require a warrant.” Kyllo, 533 U.S. at 40, 121 S.Ct. 2038 (citation omitted) (quoting Payton, 445 U.S. at 590, 100 S.Ct. 1371). Given the special status accorded a citizen’s home in Anglo-American jurisprudence, we hold that the warrantless “sniff test” that was conducted *56 at the front door of the residence in the present case was an unreasonable government intrusion into the sanctity of the home and violated the Fourth Amendment.
We quash the decision in Jardines and approve the result in Rabb.
It is so ordered.
PARIENTE, LEWIS, QUINCE, and LABARGA, JJ., concur.
LEWIS, J., specially concurs with an opinion, in which PARIENTE and LABARGA, JJ., concur.
POLSTON, J., dissents with an opinion, in which CANADY, C.J., concurs.

. The affidavit that Detective Pedraja submitted to the magistrate provided as follows, in relevant part:
"Your Affiant's” reasons for the belief that "The Premises” is being used as [a marijuana hydroponics grow lab] and that "The Property [consisting of marijuana and the equipment to grow it]” listed above is being concealed and stored at "The Premises” is as follows:
On November 3, 2006, "Your Affiant” detective William Pedraja, # 1268, received information from a crime stoppers tip that marijuana was being grown at the described residence.
On December 5, 2006, “Your Affiant” conducted surveillance at the residence and observed no vehicles in the driveway. "Your Affiant” also observed windows with the blinds closed. "Your Affiant” and Detective Doug Bartelt with K-9 drug detection dog "FRANKY” approached "The Premises” in an attempt to obtain a consent to search. While at front door [sic], "Your Affiant” detected the smell of live marijuana plants emanating from the front door of "The Premises.” The scent of live marijuana is a unique and distinctive odor unlike any other odor. Additionally, K-9 drug detection dog "FRANKY” did alert to the odor of one of the controlled substances he is trained to detect. “Your Affiant,” in an attempt to obtain a written consent to search, knocked on the front door of “The Premises” without response. "Your Affi-ant” also heard an air conditioning unit on the west side of the residence continuously running without recycling. The combination of these factors is indicative of marijuana cultivation.
Based upon the positive alert by narcotics detector dog "FRANKY” to the odor of one or more of the controlled substances that she is trained to detect and “FRANKY” [sic] substantial training, certification, and past reliability in the field in detecting those *38 controlled substances, it is reasonable to believe that one or more of those controlled substances are present within the area alerted to by "FRANKY.” Narcotics Canine handler, Detective Bartelt, Badge number 4444, has been a police officer with the Miami-Dade Police Department for nine years. He has been assigned to the Narcotics Bureau for six years and has been a canine handler since May 2004. In the period of time he has been with the Department, he has participated in over six hundred controlled substances searches. He has attended the following training and received certification as a canine handler. ...
Since becoming a team, Detective Bartelt and narcotics detector canine "FRANKY" have received weekly maintenance training. ... Narcotics detector canine "FRANKY” is trained to detect the odor of narcotics emanating from the following controlled substances to wit: marijuana.... To date, narcotics detector canine "FRANKY” has worked approximately 656 narcotics detection tasks in the field. He has positively alerted to the odor of narcotics approximately 399 times. "FRANKY’S” positive alerts have resulted in the detection and seizure of approximately 13,008 grams of cocaine, 2,638 grams of heroin, 180 grams of methamphetamine, 936,614 grams of marijuana, both processed ready for sale and/or live growing marijuana.
WHEREFORE, Affiant prays that a Search Warrant be issued ... to search "The Premises” above-described....

. The Fourth District Court of Appeal in State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006), affirmed the trial court’s suppression of illicit drugs (marijuana found growing in Rabb’s house) following a warrantless "sniff test” by a drug detection dog at the front door of Rabb’s home. The district court based its ruling on Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), reasoning as follows:
[Our logic here] is no different than that expressed in Kyllo, one of the recent pronouncements by the United States Supreme Court on law enforcement searches of houses. The use of the dog, like the use of a thermal imager, allowed law enforcement to use sense-enhancing technology to intrude into the constitutionally-protected area of Rabb’s house, which is reasonably considered a search violative of Rabb's expectation of privacy in his retreat. Likewise, it is of no importance that a dog sniff provides limited information regarding only the presence or absence of contraband, because as in Kyllo, the quality or quantity of *39 information obtained through the search is not the feared injury. Rather, it is the fact that law enforcement endeavored to obtain the information from inside the house at all, or in this case, the fact that a dog’s sense of smell crossed the "firm line” of Fourth Amendment protection at the door of Rabb’s house. Because the smell of marijuana had its source in Rabb’s house, it was an “intimate detail” of that house, no less so than the ambient temperature inside Kyl-lo’s house. Until the United States Supreme Court indicates otherwise, therefore, we are bound to conclude that the use of a dog sniff to detect contraband inside a house does not pass constitutional muster. The dog sniff at the house in this case constitutes an illegal search.
Rabb, 920 So.2d at 1184.

.We note that the First District Court of Appeal in Stabler v. State, 990 So.2d 1258 (Fla. 1st DCA 2008), also certified conflict with Rabb. In Stabler, the district court held that a dog “sniff test” conducted at an apartment door that opens onto a common area accessible to the general public does not constitute a "search” for Fourth Amendment purposes. As noted herein, Stabler is distinguishable from Rabb in that Stabler involved a "sniff test” conducted at an apartment or other temporary dwelling, not a "sniff test” conducted at a private residence. See infra note 10.

. The comparable provision of the Florida Constitution is contained in article I, section 12, which further provides: "This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court.” Art. I, § 12, Fla. Const.

. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (addressing the issue of whether police, without a warrant, can listen to and record one end of a telephone conversation in a public phone booth via an electronic listening and recording device attached to the outside surface of the booth).

. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (addressing the issue of whether police, based on an evidentiary showing of less than probable cause, can temporarily seize and search a person).

. There is little doubt, however, that a dragnet-style sweep of an entire residential neighborhood or of a multi-unit residential dwelling, conducted without any individualized suspicion of wrongdoing, would be impermissible. Cf. City of Indianapolis v. Edmond, 531 U.S. at 41, 121 S.Ct. 447 (“We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion.”).

. Compare State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006) (holding that a dog "sniff test” outside a private residence is a "search” within the meaning of the Fourth Amendment); with People v. Jones, 279 Mich.App. 86, 755 N.W.2d 224 (2008) (holding that a dog “sniff test” outside a private residence is not a *50 "search” within the meaning of the Fourth Amendment); and Porter v. State, 93 S.W.3d 342 (Tex.App.2002) (holding that a dog "sniff test” outside a private residence is not a "search" within the meaning of the Fourth Amendment); and Rodriguez v. State, 106 S.W.3d 224 (Tex.App.2003) (holding that a dog “sniff test” outside a private residence is not a “search” within the meaning of the Fourth Amendment).

. See United States v. Tarazon-Silva, 960 F.Supp. 1152 (W.D.Tex.1997) (holding that a dog "sniff test” outside a private residence is not a "search” within the meaning of the Fourth Amendment).

. Compare State v. Ortiz, 257 Neb. 784, 600 N.W.2d 805 (1999) (holding that a dog "sniff test” outside an apartment is a "search” within the meaning of the Fourth Amendment); with Fitzgerald v. State, 384 Md. 484, 864 A.2d 1006 (2004) (holding that a dog "sniff test” outside an apartment is not a "search” within the meaning of the Fourth Amendment); and Stabler v. State, 990 So.2d 1258 (Fla. 1st DCA 2008) (holding that a dog "sniff test” outside an apartment is not a "search” within the meaning of the Fourth Amendment); and Nelson v. State, 867 So.2d 534 (Fla. 5th DCA 2004) (indicating that a dog "sniff test” outside a hotel room is not a "search” within the meaning of the Fourth Amendment); and People v. Dunn, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054 (1990) (holding that a dog "sniff test" outside an apartment is not a "search” within the meaning of the Fourth Amendment, but is a search within the meaning of the state constitution).

.Compare United States v. Whitehead, 849 F.2d 849 (4th Cir.1988) (holding that a dog "sniff test” outside a railway sleeper compartment is a "search” within the meaning of the Fourth Amendment); and United States v. Thomas, 757 F.2d 1359 (2d Cir.1985) (holding that a dog "sniff test” outside an apartment is a "search” within the meaning of the Fourth Amendment); with United States v. Brock, 417 F.3d 692 (7th Cir.2005) (holding that a dog "sniff test” outside a locked bedroom is not a “search” within the meaning of the Fourth Amendment); and United States v. Roby, 122 F.3d 1120 (8th Cir.1997) (indicating that a dog "sniff test” outside a hotel room is not a "search” within the meaning of the Fourth Amendment); and United States v. Colyer, 878 F.2d 469 (D.C.Cir.1989) (holding that a dog "sniff test” outside a railway sleeper compartment is not a "search” within the meaning of the Fourth Amendment); and United States v. Broadway, 580 F.Supp.2d at 1179 (D.Colo.2008) (holding that a dog "sniff test” outside an apartment is not a "search” within the meaning of the Fourth Amendment).